DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Alisa D. Stringer has appealed from her conviction in the Medina County Court of Common Pleas of burglary in violation of R.C. 2911.12(A)(4). This Court affirms.
 I {¶ 2} On October 22, 2003, Appellant was indicted on one count of burglary in violation of R.C. 2911.12(A)(3), a felony of the third degree. At her arraignment on December 22, 2003, Appellant pled "not guilty" to the charge. A jury trial commenced on March 17, 2004. On March 18, 2004, Appellant was found not guilty of burglary under R.C. 2911.12(A)(3), a felony of the third degree, but guilty of burglary under R.C. 2911.12(A)(4), a felony of the fourth degree. On April 19, 2004, Appellant was sentenced to one year incarceration.
 {¶ 3} Appellant has timely appealed her conviction, asserting two assignments of error.
 II Assignment of Error Number One
"There was insufficient evidence to support the jury's verdict, and [appellant's] conviction for burglary was against the manifest weight of the evidence."
 {¶ 4} In her first assignment of error, Appellant has argued that there was insufficient evidence to convict her of burglary and that the conviction was against the manifest weight of the evidence. Specifically, Appellant has asserted that the State "failed to establish the essential element of `force, stealth, or deception.'" We disagree.
 {¶ 5} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id, at paragraph two of the syllabus; see, also,Thompkins, 78 Ohio St.3d at 386.
 {¶ 6} In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury. * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. (emphasis omitted).
 {¶ 7} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 8} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 9} Appellant was convicted of burglary, in violation of R.C. 2911.12(A)(4). Pursuant to R.C. 2911.12(A)(4):
"(A) No person, by force, stealth, or deception, shall do any of the following:
"(4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present."
 {¶ 10} During the trial the State presented testimony from three witnesses. Linda Atkins ("Aktins") testified to the following. On September 20, 2003, Aktins was living at 4407 Laurel Road, Apartment 214 in Brunswick, Ohio. She called the Brunswick Police Department ("BPD") on September 20, 2003 around noon to report a disturbance because the children above her apartment had been "jumping all morning long." The BPD responded and Atkins completed a complaint about the disturbance. The officer was at Atkins apartment for less than five minutes. After the officer left, Atkins heard a knock at her door and believed it was the officer returning to talk with her about the complaint.
 {¶ 11} Atkins continued her testimony explaining that she thought the officer had come back because when she had made previous complaints about the upstairs neighbors the BPD always returned to Atkins' apartment after talking to the upstairs neighbors. Atkins heard the knock less than ten minutes after the officer left her apartment. When Atkins opened her door she saw three people standing in the hallway; Atkins identified Appellant as the person closest to the door. Appellant started yelling at Atkins about her kids stating that they were just playing; Atkins did not respond. Atkins tried to close her door, but Appellant had placed her foot in the door. Appellant was standing outside of Atkins' apartment with her foot in the door, keeping Atkins from closing the door.
 {¶ 12} Atkins testified that she did not invite Appellant into her apartment and that she did not want Appellant entering her apartment. After realizing she could not close the door, Atkins backed away from the door to call the police. As Atkins was calling the police, Appellant told her, "It doesn't matter if you call them because they won't get here in time." While Atkins was on the phone with 911, Appellant walked into Atkins' apartment and started taking pictures. Atkins continued to tell Appellant to get out of her apartment. Atkins did not know what Appellant was taking pictures with but she grabbed the object out of her hand. Atkins later learned that Appellant was taking the pictures with her cell phone. After Atkins grabbed Appellant's cell phone, Appellant yelled "Give me my phone back," and a struggle occurred.
 {¶ 13} Atkins testified that during the struggle Appellant started choking her. Atkins was standing up before she was choked, but Appellant pushed her down and continued choking her. Atkins may have grabbed Appellant's hair. While Appellant was choking Atkins, one of the other people outside the door entered Atkins' apartment and started yelling at Appellant to get off of Atkins. The other person was physically trying to remove Appellant from Atkins. Atkins does not remember what happened next because she "was unconscious." When Atkins awoke she was disoriented and called the police again and informed them of what had just occurred. When Atkins recovered consciousness, Appellant was no longer in Atkins' apartment.
 {¶ 14} Atkins testimony continued and she explained that a hammer was on the floor near where the struggle occurred because she had been putting nails up in her daughter's room, but the hammer was not used by her or the Appellant during the incident. Atkins denied hitting Appellant with the hammer. Atkins admitted that she and Appellant had problems in the past and that they do not get along.
 {¶ 15} On cross-examination, Atkins testified to the following. Appellant had previously threatened Atkins. Atkins made multiple complaints about the noise from her upstairs neighbors. When Appellant was at Atkins' door, Atkins did not like the fact that Appellant was taking pictures of Atkins' daughter's rabbits. Atkins could not remember if the struggle started when she tried to take Appellant's phone out of her hand. Atkins denied that she and Appellant fell on one of the rabbit cages when the struggle began. Atkins was bleeding around her neck, but did not go to the hospital.
 {¶ 16} On re-direct examination, Atkins testified to the following. Atkins did not pull Appellant into her apartment when she grabbed the cell phone. Atkins did not feel her injuries required medical attention, so she did not go to the hospital.
 {¶ 17} On re-cross examination, Atkins first testified that Appellant did not enter her apartment when she was on the phone with the BPD, but then stated that Appellant entered her apartment while she was on the phone with the BPD. When questioned about the inconsistency, Atkins testified that she misunderstood the question, but Atkins did not clarify her answer.
 {¶ 18} The State next called Tiffany Watzelza ("Watzelza"), and she testified to the following. At the time of the incident, Watzelza, a sixteen year-old female, lived at 4407 Laurel Road, Apartment 314 in Brunswick, Ohio, with her mother and younger sister. On September 20, 2003, Watzelza's mother was babysitting Appellant's three children. The police visited Watzelza's apartment and told them to "stop all the noise and quiet down." No one was arrested and no one received a ticket or citation. About two or three minutes after the police left, Appellant arrived. Appellant went downstairs to ask the Atkins why she called the police. Every time Appellant's children are in the apartment Atkins calls the police.
 {¶ 19} Watzelza continued her testimony stating the following. Watzelza and her older cousin, Sheena, went with Appellant to Atkins' apartment "[t]o make sure nothing happened." Appellant was not yelling at Atkins. Atkins was on the phone before she answered the door and she hung up. After answering the door, Atkins picked up the phone and called the police. Appellant took pictures of the rabbit cages. Atkins grabbed Appellant and tried to take her cell phone away and they both fell to the floor. When Atkins grabbed the cell phone she and Appellant were by the door "sort of in the house." When the two were on the floor, Atkins was on the floor and Appellant was on top of her, with Atkins pulling Appellant's hair. Appellant was trying to get up from Atkins pulling her hair. Watzelza then ran upstairs to get her mother's friend and Sheena stayed behind.
 {¶ 20} Watzelza continued her testimony. Appellant did not go into the apartment and Atkins did not pull her into the apartment, but when they fell Appellant was all the way in the apartment. Watzelza did not see Appellant's hands on Atkins' neck. Watzelza has not seen Sheena since the day after the incident and no one knew where Sheena was living after the incident.
 {¶ 21} On cross-examination, Watzelza testified to the following. Atkins was on the phone when she opened the door, with the cord stretching to the door. Atkins left the door and ended that call and called the police. While Atkins was calling the BPD, Appellant, standing in the doorway, started taking pictures. Then Appellant "walked halfway in, not all the way in, and then she just started taking the pictures." Appellant was taking pictures of the rabbit cages because under the lease agreement residents are not allowed to have pets. When Atkins tried to take Appellant's cell phone away the two fell over the rabbit cages; Appellant did not attack Atkins when they fell. Appellant was heard repeatedly saying "Let go of me." Atkins was holding onto Appellant's hair and Appellant asked her to "Let go of my hair." Watzelza went upstairs after she saw Atkins start pulling Appellant's hair.
 {¶ 22} On re-direct examination, Watzelza testified to the following. After Appellant went into Atkins apartment to take the pictures, Atkins screamed for Appellant to get out of her house. In her written statement to the BPD, Watzelza stated that she went downstairs with Appellant "to make sure [Appellant] didn't start anything."
 {¶ 23} On re-cross examination, Watzelza testified that when she previously testified that Appellant went into Atkins' apartment she meant Appellant was standing just inside the doorway, with her arm extended into the apartment taking pictures.
 {¶ 24} Officer Sikon of the BPD testified to the following for the State. On September 20, 2003, Officer Sikon responded to the Laurel Hill Apartments after receiving a broadcast from dispatch that they could hear fighting in the background of a call and someone was calling for help and that they were being attacked. Atkins informed Officer Sikon that she had been attacked by an unknown female that had come to her doorway. Atkins "had a bump on [her] head and some scratches on the front of her neck, but [Officer Sikon] didn't really determine if they were from [Appellant] * * * or from [Atkins] massaging her neck from the injury." Atkins told Officer Sikon that when she answered her door and then tried to close it, Appellant put her foot in the doorway and the door would not close. Atkins told him that when she went into her apartment to call the police Appellant entered her apartment and Atkins grabbed what was in Appellant's hand, "not knowing what it was, and they got in a tug of war and hair was pulled and they went down on the floor." Atkins also told Officer Sikon that while she was being choked unconscious by Appellant she could hear someone telling Appellant to let her go.
 {¶ 25} Officer Sikon's continued his testimony. He did not take a statement from Appellant on September 20, 2003 because she had already left the apartment complex. Officer Sikon left word with Watzelza's mother that he wanted to speak with Appellant. Appellant left Officer Sikon a voice message, but did not leave a return number. The Monday after the incident, Officer Sikon went to Appellant's place of employment, Fifth Third Bank in Brunswick, but Appellant had called off sick. After obtaining Appellant's home address from the bank, Officer Sikon went to Appellant's home. He advised Appellant of her rights and asked her if she wanted to make a statement. Appellant made a verbal statement and later wrote a statement for Officer Sikon.
 {¶ 26} Officer Sikon testified that he learned the following from Appellant. Appellant was upset because Atkins was always complaining about her kids making too much noise. Appellant went to Atkins' apartment to see if they could reach a compromise and things got out of hand. Appellant admitted to keeping Atkins from slamming the door in her face and to taking pictures of the rabbit cages. Appellant admitted to being on top of Atkins, but Officer Sikon could not recall if Appellant said anything about choking Atkins.
 {¶ 27} Appellant's written statement taken by Officer Sikon three days after the incident, September 23, 2003, was marked into evidence and read to the jury by Officer Sikon. In the statement, Appellant stated that when she arrived at 4407 Laurel Road to pick up her children after work she learned that the downstairs neighbor had called the police about her children making too much noise. Appellant wrote that:
"[she] went downstairs to talk to [Atkins] in hopes of getting her to understand that [her] children are two twin boys that are 2½ yrs [sic] old and a 6 yrs [sic] old girl, it was the middle of the afternoon most children are not able to sit quietly in a chair all day nor should they have too [sic]."
Appellant asked Atkins to talk about the noise and Atkins informed Appellant that she was going to call the police and went to close the door. Appellant wrote that as Atkins was trying to close the door she:
"held the door open with [her] foot [Atkins] went to the phone [Appellant] told her [she] just wanted to talk to [Atkins] to make a compromise, they are children, [Atkins] began yelling at [Appellant] and talking to cops on the phone at point [Appellant] notice [sic] several cages with animals in them on the floor so [Appellant] began to try take pictures [sic] with [her] camera phone [Atkins] when walked [sic] over to [Appellant] and grabbed [Appellant's] hand tring [sic] to take [her] phone."
Appellant's written statement reads that when Atkins tried to get the phone out of Appellant's hand, the two fell down together. Appellant then wrote that Atkins:
"began to pull [Appellant's] hair and wouldn't let go, [Atkins] still had [Appellant's] phone and head [Atkins] would not let go finally [Atkins] let phone [sic] go to triy [sic] to reach for a hammer witch [sic] was near her, she was going for the hammer [Appellant] grabbed it and threw it so [Atkins] could not hit [Appellant] with it."
Appellant wrote that her neck and head were hurting so badly from the incident that she stayed home from work the following Monday.
 {¶ 28} After reading Appellant's written statement, Officer Sikon continued his testimony as follows. Officer Sikon did not observe any injuries on Appellant. Officer Sikon spoke with Sheena and she was concerned that if she did not intervene in the incident than Atkins would have suffered some injury.
 {¶ 29} On cross-examination, Officer Sikon testified to the following. Rabbits were living in the apartment. There is no evidence beyond Atkins' statement that Atkins was unconscious at any point during or after the incident. Atkins admitted having a hammer on the floor, but informed Officer Sikon that she never used it.
 {¶ 30} After admitting Appellant's statement, the State rested its case and Appellant made a Crim.R. 29 motion. The trial court overruled Appellant's motion.
 {¶ 31} Appellant testified on her own behalf to the following. When she arrived to pick up her children she was informed by Watzelza that Atkins had called the police to complain about the children. Appellant went downstairs to "find out what was going on with her." Appellant "thought maybe if [she] talked to [Atkins] to find out what was going on with her, [they] could come to some compromise." Atkins told Appellant she did not have anything to say to Appellant. With Appellant still in the hallway, Atkins then "went to slam the door in [Appellant's] face, and [Appellant] put [her] hand and foot up to shield the door from being hit."[1] Atkins went to call the police and Appellant told her that was fine and she remained in the hallway to wait for the police. After seeing animal cages and animals in Atkins' apartment, Appellant decided to use her camera phone to take pictures because as a former resident of the complex she knew Atkins was not allowed to have pets. To take the pictures, Appellant extended her hand into the apartment. Appellant told Atkins she was taking pictures of the animals and that she was going to give the photographs to the management and inform the Brunswick Zoning Board. While on the phone calling the police, Atkins tried to grab Appellant's phone and Appellant told her, "Get off me. Leave me alone. Let me go." As a result of Atkins pulling on Appellant's phone and Appellant not wanting to let go of her phone, the two fell into Atkins' apartment. Atkins let go of her home phone and continued to attempt to take Appellant's phone. Atkins then began grabbing Appellant's hair and "gouging" Appellant. Appellant continued to tell Atkins to let her go. While on the ground with Atkins, Appellant saw a small hammer and thought Atkins was going to grab it so Appellant grabbed it and threw it out of reach. Appellant did not intend to harm Atkins. Appellant was able to "get [her] body weight on top of [Atkins], * * * and [Atkins] eventually released [Appellant's] hair." Appellant got up, walked out of the apartment, retrieved her children, and went home. Sheena never picked Appellant up off of Atkins.
 {¶ 32} Appellant continued her testimony testifying to the following. Appellant suffers from migraines and a bad back. The incident brought on a migraine and Appellant spent most of the weekend resting, while her grandmother cared for her children. Appellant also suffered from "gobs of hair falling out for a couple of days." Appellant called the police after receiving word from her friend that the police wanted to speak to her about the incident. Appellant did not intend to flee, she just wanted to leave the apartment complex. Appellant drove home after the incident and Watzelza's mother knew where Appellant lived.
 {¶ 33} On cross-examination, Appellant testified to the following. Appellant did not see the police leave the apartment complex. Appellant was upset, mad, and irritated that Atkins had called the police and she went downstairs to try and reach a compromise. Appellant's foot and hand were in the doorway to stop the door from hitting Appellant. Appellant did not enter the apartment and take pictures, she extended her hand to take pictures and Atkins attempted to grab the phone from her. Appellant believed Atkins was prejudiced and wanted Atkins to move to another complex because she was constantly complaining about noise. Atkins did not lose consciousness and Appellant did not choke her. Appellant and Atkins had previously had a non-polite conversation in the apartment complex stairway, but that was not on Appellant's mind when she went to Atkins' apartment.
 {¶ 34} At the close of Appellant's case, Appellant renewed her Crim.R. 29 motion. The trial court denied the motion.
 {¶ 35} Appellant has argued that the State failed to establish that Appellant entered the apartment by "force, stealth, or deception." The State has argued that, while Appellant did not use stealth or deception to enter the apartment, she clearly entered the apartment by "force" when she put her foot in the doorway prohibiting Atkins from closing the door. The State has further argued that Appellant exhibited force when she put her arm inside the apartment to take the pictures. Pursuant to R.C. 2901.01(A)(1): "`Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."
 {¶ 36} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trial court clearly lost its way when it found Appellant guilty of burglary. The trial court was in the best position to adjudge the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The credible testimony of Atkins, Watzelza, and Officer Sikon established that Appellant committed the crime of burglary under R.C. 2911.12(A)(4).
 {¶ 37} Based on the foregoing, this Court cannot find that Appellant's conviction was against the manifest weight of the evidence. Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency."Roberts, supra at 4. Accordingly, having found that Appellant's conviction was not against the manifest weight of the evidence, this Court need not discuss further her challenge to the sufficiency of the evidence. Appellant's first assignment of error is not well taken.
 Assignment of Error Number Two
"The trial court erred by refusing to give [appellant's] requested jury instruction on the lesser-included offense of criminal trespass."
 {¶ 38} In her second assignment of error, Appellant has argued that the trial court erred when it refused to give a jury instruction on the lesser-included offense of criminal trespass. Specifically, Appellant has asserted that "[t]he trial court erroneously declined to instruct the jury on the lesser-included offense of criminal trespass based on its mistaken belief that, since Atkins' apartment was a permanent or temporary habitation, `there cannot be trespass without committing the offense of felony four burglary[.]'" Appellant has argued that a criminal trespass instruction was appropriate because Atkins' apartment also constituted "premises of another" under the criminal trespass statute. We disagree.
 {¶ 39} Prior to giving the jury instructions, the trial court confirmed that Appellant wanted a jury instruction on the lesser included offense of burglary under R.C. 2911.12(A)(4) and Appellant stated she wanted that instruction. Appellant then also stated that she wanted a trespass instruction. The trial court declined to give a trespass instruction explaining:
"I want to put it on the record for the specific reason that (A)(4) instruction says that, `No person by force, stealth, or deception, shall do any of the following: Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice is present or likely to be present.'
"The Court believes, under the circumstances, that there cannot be a trespass without committing the offense of felony four burglary, since we're dealing with a permanent or temporary habitation."
Appellant objected to the trial court's refusal to give the trespass instruction and argued that the place in question was an apartment complex and that Appellant was in the hallway and possibly her toes were in the apartment before Atkins pulled her into the apartment. The State then argued that "if there was a trespass into the apartment, it's clearly the permanent habitation of [Atkins], which is a burglary by law[.]" The trial court stated: "Okay. I wanted to permit you to have that put on the record" and continued with jury instructions.
 {¶ 40} When reviewing a trial court's jury instructions, this Court reviews the record to determine whether the trial court's decision to give or decline to give a requested jury instruction constitutes an abuse of discretion under the facts and circumstances of the case. State v. Wolons (1989),44 Ohio St.3d 64, 68. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 41} In State v. Deem, the Ohio Supreme Court set out the standard for deciding what constitutes a lesser included offense.State v. Deem (1988), 40 Ohio St.3d 205, 209. In Deem, the court found that:
"An offense may be a lesser included offense of another if (i) the offense carries [sic] a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. Id. (Emphasis sic).
While a crime may constitute a lesser included offense, it does not follow that a lesser included offense instruction is mandatory; "[a]n instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." State v. Carter
(2000), 89 Ohio St.3d 593, 600.
 {¶ 42} Appellant was indicted for burglary under R.C.2911.12(A)(3), a felony of the third degree. Pursuant to R.C.2911.12(A)(3):
"(A) No person, by force, stealth, or deception, shall do any of the following:
"(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense[.]"
 {¶ 43} Appellant was found guilty of burglary under R.C.2911.12(A)(4), a felony of the fourth degree. Pursuant to R.C.2911.12(A)(4), a person cannot by force, stealth, or deception "[t]respass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." R.C. 2911.12(A)(4)
 {¶ 44} Pursuant to R.C. 2911.21, the criminal trespass statute Appellant has argued should have been presented to the jury:
"(A) No person, without privilege to do so, shall do any of the following:
"(1) Knowingly enter or remain on the land or premises of another;
"(2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows he is in violation of any such restriction or is reckless in that regard;
"(3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access;
"(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either.
"* * *
"(D) Whoever violates this section is guilty of criminal trespass, a misdemeanor of the fourth degree.
"(E) As used in this section, `land or premises' includes any land, building, structure, or place belonging to, controlled by, or in custody of another, and any separate enclosure or room, or portion thereof." R.C. 2911.21.
This Court has previously found that "[c]riminal trespass is a lesser included offense of burglary because one need only knowingly enter or remain on the land of another without privilege to do so." State v. Parker (April 19, 2000), 9th Dist. No. 98CA007216, at 7. Accordingly, we must only review whether the trial court erred in refusing to give the instruction in this particular case, not whether criminal trespass is a lesser included offense of burglary.
 {¶ 45} In light of the record before the trial court, this Court cannot find that the trial court abused its discretion in denying Appellant's request for a criminal trespass instruction. The uncontroverted testimony at trial established that Appellant used force when she placed her foot and hand to prevent Atkins from closing the door. Also, the testimony established that after that use of force Appellant entered Atkins' apartment without permission. Further, Appellant was on trial for her forced entry into Atkins' apartment, not her presence in the apartment complex hallway or building, and as a result of that, at trial Appellant was convicted of trespassing in Atkins' permanent habitation when Atkins was present. Based on the foregoing, this Court cannot say that the evidence presented at trial would reasonably support both an acquittal on the charge of burglary and a conviction upon the lesser included offense of criminal trespass. Accordingly, Appellant's second assignment of error is not well taken.
 III {¶ 46} Appellant's two assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J., Boyle, J., Concur.
[1] The prosecution credibly noted during cross-examination of Appellant that if Appellant was in the hallway and not in Atkins' apartment she would not have had to put her foot and arm out to protect herself from the closing door because she could not be hit by the door while in the hallway.