[Cite as *State v. Heft*, 2009-Ohio-5908.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 8-09-08

    v.

BRIAN HEFT,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 07 08 155

**Judgment Affirmed**

Date of Decision: November 9, 2009

APPEARANCES:

    *Alison Boggs*  for Appellant

    *Daniel LaRoche*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Brian L. Heft, appeals the judgment of the Logan County Court of Common Pleas convicting him of two counts of gross sexual imposition. On appeal, Heft argues that R.C. 2907.05 is unconstitutional as applied to him; that the trial court erred in ordering consecutive sentences; that the jury verdicts were against the manifest weight of the evidence; that he was prejudiced by the trial court's *Howard* charge to the jury after the jury indicated an inability to reach a verdict; that he was denied his constitutional right to a speedy trial; that the second indictment was constitutionally deficient, as it was intentionally vague and denied him the ability to form a proper defense; that he did not receive a fair trial because the trial court permitted introduction of evidence of other bad acts; and, that he was deprived of effective assistance of counsel. Based upon the following, we affirm the judgment of the trial court.

{¶2} In September 2007, the Logan County Grand Jury indicted Heft on Count One: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Two: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Three: sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree; Count Four: sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree; Count Five: gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree; and, Counts Six, Seven, Eight, Nine,

and Ten: gross sexual imposition in violation of R.C. 2907.05(A)(1), all felonies of the fourth degree. The indictment stemmed from a multiple year course of conduct during which Heft allegedly sexually abused his stepdaughter, S.W.

{¶3} In December 2007, Heft waived his speedy trial rights. Additionally, Heft filed a motion to continue the jury trial, which had been scheduled for January 8, 2008,[1] on the basis that he required additional time to prepare for trial. Thereafter, the trial court vacated the trial date of January 8, 2008, and rescheduled the date to February 21, 2008.

{¶4} In February 2008, Heft filed a motion to vacate the trial date of February 21, 2008, on the basis that he again required additional time to prepare for trial. Additionally, Heft reiterated that he waived his right to have the case tried within the statutory period. Thereafter, the trial court vacated the trial date of February 21, 2008, and rescheduled the date to April 29, 2008.

{¶5} In April 2008, the State moved the trial court for an order pursuant to Crim.R. 7(D) to amend the indictment to include in each charge the culpable mental state.

{¶6} In May 2008, the trial court overruled the State's motion to amend the indictment, and dismissed the September 2007 indictment without prejudice.

---

[1] Heft's motion stated that the trial was scheduled for January 8, 2007; however, the year was clearly a typographical error, given that motion was filed in December 2007.

{¶7} In July 2008, the Logan County Grand Jury indicted Heft on Count One: rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count Two: sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree; Count Three: gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree; and, Count Four: gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree. Thereafter, Heft entered a plea of not guilty to all counts in the indictment.

{¶8} In August 2008, Heft filed a motion to dismiss the indictment on the basis that the State had violated his speedy trial rights, and that the speedy trial waivers he had filed in conjunction with the September 2007 indictment did not apply to the July 2008 indictment.

{¶9} In September 2008, the trial court overruled Heft's motion to dismiss, finding that, unlike a speedy trial waiver, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case based on the same underlying facts and circumstances.

{¶10} In October 2008, Heft filed a motion to vacate the trial date of October 28, 2008, which the trial court granted, assigning the matter for jury trial on February 18, 2009.

{¶11} In February 2009, the case proceeded to jury trial, at which the following testimony was heard.

-4-

{¶12} Officer Andrew Kennedy of the Bellefontaine Police Department testified that, on July 23, 2007, he spoke to S.W. at the police department; that S.W. was accompanied by her friend, Victoria Early, and her friend's mother, Bridget Early; that it was very difficult for S.W. to speak and she was emotional; and, that S.W. alleged that she had been sexually abused by Heft, and detailed multiple specific incidents of sexual abuse.

{¶13} Victoria Early testified that she had been close friends with S.W. for about five years at the time of the trial; that she observed S.W. and Heft interact as stepparent and stepdaughter on many occasions; that she did not believe Heft was as encouraging as a father figure should be; that Heft made negative comments to S.W. about her weight and appearance; that Heft also had a negative attitude regarding S.W.'s boyfriends; that Heft was rude to S.W.'s boyfriend and called him names; that S.W.'s role in the household was uncommon because she often cooked, cleaned, and looked after her younger brother; that she believed S.W. had taken on this role because S.W.'s mother, Bridget Heft, had health issues; that she observed that Bridget Heft spent most of the day watching television and drinking alcoholic beverages, and that she did not really clean; and, that, from her observations, she believed Heft and Bridget had more of a friendship than a marriage.

{¶14} Early continued that, on the third Thursday of July in 2007, S.W. called her and asked her to pick her up; that S.W. was very distressed and upset; that S.W. came out of the house carrying her work clothing, but nothing else; that S.W. stayed at the Earlys' home from Thursday until Sunday; that she thought it was strange that S.W. brought no other clothing with her; that, when she arrived home from work at approximately 7:00 a.m., she and her mother watched a movie about a young woman being raped and then testifying in court; that S.W. awoke and came down to watch the movie; that S.W. appeared upset during the movie, but that did not surprise her because "she had been upset pretty much the whole weekend" (trial tr., p. 120); that, after the movie ended, S.W. began crying, told her and her mother that she had something she needed to tell them, and said that she could never go back home; that her mother called S.W.'s older brother, Nick, to pick her up; that she and her mother then accompanied S.W. to the police station, where police officers interviewed S.W.; that she never witnessed any sexual acts between Heft and S.W. or heard S.W. make such accusations in the past; and, that the Heft family was always pleasant to her when she was at their home.

{¶15} Detective Scott Sebring of the Bellefontaine Police Department testified that, through his training, he was aware that many child victims of sexual abuse delay disclosure due to fear of not being believed, fear of discipline, fear of

financial difficulty if the perpetrator is the primary financial support of the family, and fear of breaking up the family; that he interviewed Heft after he was arrested; that Heft denied the allegations; that he also interviewed Bridget Heft, who told him that she did not know anything about the allegations and that S.W. had never made such allegations to her; that, although S.W. had told him that her step-grandmother who lived with the family was suspicious of Heft, he did not interview the step-grandmother; that he did not examine either the Heft family's prior or current residence for DNA evidence; that he did not believe he would find any forensic evidence in the Hefts' household because it was clean and well-kept; and, that he did not examine any computers in the household because there was no indication that anything relevant would be contained on a computer.

{¶16} S.W. testified that, throughout her childhood, she lived in a household with her stepfather, Heft, her mother, Bridget Heft, her younger brother, Shawn, her older brother, Nick, and intermittently her step-grandmother, Beatrice; that Heft and her mother married when she was two years old, and he was the only father figure she had known; that the family resided on Reservoir Road in Bellefontaine between the dates of January 19, 2001, and June 3, 2004; that the family resided on Highview Drive in Bellefontaine between the dates of June 3, 2004, and July 23, 2007; that Heft was the primary financial provider for the family because her mother did not work, although she received social security

payments; that her mother suffered multiple strokes and required brain surgery prior to the family moving to Bellefontaine in 2001; that her mother's stroke changed the dynamics of the household because she could no longer take care of the children due to speech problems and difficulties with her hand; that she did whatever she could to help take care of her younger brother and clean; that she rarely saw Heft and her mother together; that her mother watched television often and would drink several cans of beer per night; that her mother would consume alcohol to the point that she would stumble and nearly fall; and, that she did not believe it was the stroke that caused her mother to lose her balance.

{¶17} S.W. continued that she did not get along well with Heft; that Heft sexually abused her when the family lived at both the Reservoir Road and Highview Drive residences; that, on Christmas Eve in 2001 or 2002, when the family lived on Reservoir Road, Heft had stayed up at night to cook a turkey; that Heft came into her room that night and summoned her to the door; that she went over to the door, and Heft pulled her pants and underwear down; that Heft attempted to kiss her near her vagina; that she pulled her pants and underwear up and went over to her bed to lie down, and Heft left the room; that Heft then came back into her room, pulled her covers off, pulled her pants down, and "started kissing [her] all over [her] body" (Id. at 171); that she attempted to keep her pants up, but Heft continued to try to kiss her lower and lower; that she could not do

anything to stop him but attempt to keep her pants up; that Heft "succeeded in everything that he tried" (Id. at 172); that other people were in the home when this incident occurred, but they were asleep; that she did not tell anyone immediately after the incident occurred because Heft "had threatened that if anything happened to him, [her] mom and brother would both be out on the streets" (Id. at 174); that she took Heft's threats seriously because he was manipulative and controlling and she was afraid of him; that, when Heft would become angry with her, he would tell her mother that she was treating him like "dirt"; and, that she never consented to Heft touching her in a sexual manner.

{¶18} S.W. continued that many instances of sexual abuse occurred once the family moved to the Highview residence; that, approximately every other day, while she was sleeping in her room, Heft would touch her breasts without her consent; that she tried to keep her arms as tight as she could, but it did not prevent Heft; that the abuse impacted her to the point that she overdosed on prescription Amitriptyline in June 2006; that she took the medication with the goal of killing herself because she "couldn't take the abuse" (Id. at 187); that, on one occasion in July 2006 during the week of the Logan County Fair, she came home from tennis practice to get permission to go to the fair; that Heft told her to lie on his bed, and then "scooted" her to the edge of the bed; that Heft removed her pants and underwear, opened her legs, and engaged in vaginal intercourse with her for

several minutes; that she "pretty much just laid [sic] there and waited for it to be over" (Id. at 181); that, when the assault ended, she retrieved her clothing and went to the fair; that no one else was in the home at the time of this assault, and she believed her mother had taken her younger brother to run errands, as she did from time to time; that, sometime after the fair ended, in August 2006, Heft again engaged in vaginal intercourse with her in his bed; that this occasion was not as forceful as the first, but "it wasn't easy to stop him either" (Id. at 185); that Heft never mentioned the abuse except when it was occurring, except that he would ask her questions such as "do you think my penis is big" (Id. at 188); that Heft told her that "he didn't feel like he was [her] father and that he didn't feel like [she] was his daughter because [they] weren't blood" and that the only two people he loved "in that way" were her and her mother (Id. at 188); that Heft threatened to leave her mother and brother if she told anyone about the abuse; that, in July 2007, she went to visit a college with a friend, which provoked an argument between her and Heft; that she "couldn't take it" so she left to go to the Early household for several days (Id. at 194); that, on Sunday, she watched part of a movie with Victoria and Bridget Early about a woman who had been sexually abused; that she had flashbacks of Heft abusing her and became very emotional; that she began crying and told Victoria and Bridget Early about the abuse; that she did not make up the story about the abuse in order to get out of the home and her tumultuous

relationship with her parents; and, that the movie did not plant the idea of sexual abuse accusations in her head.

{¶19} On cross-examination, S.W. testified that the incident on Christmas Eve at the Reservoir Road residence may have occurred in 2002 and not 2001, if receipts existed demonstrating that the family was not at home, but in Canal Winchester, on Christmas Eve in 2001; that she could not remember if the first instance of penetration occurred when she was sixteen, seventeen, or eighteen; that the second incident occurred in August before school started, but she could not remember the exact date; that her attempted suicide on Father's Day in 2006 occurred prior to the incidents of penetration, but after some of the touching incidents; that she lied to the hospital staff and told them she was not trying to kill herself; that it is possible she told the hospital staff that she and her parents were arguing because she was staying out late with her boyfriend, but she did not remember; that, the day she left home, her parents were not having any problems with her; that her parents did not complain to her that she was not completing her forms for college; that her parents did not have a problem with her staying out late; that they did not tell her to "straighten up" or move out; that she never told the police that her mother was mentally disabled, and the police report stating that was a mistake; that, although she helped cook and clean in the household, her mother did most of it; that she never did laundry; that she told her friends she was

doing a lot of cooking and cleaning at the house; that she did not tell her mother about the penetration incidents because she had "told her once before and she never did anything" (Id. at 230); and, that, on Father's Day in 2007, several months before making the accusations, she gave Heft a card telling him that she appreciated everything he did for her, was glad he was her father, would always love him, and that he was the "greatest father in the whole world." (Id. at 236).

{¶20} Thereafter, the State rested and Heft moved for dismissal of the indictment pursuant to Crim.R. 29. The trial court overruled Heft's motion. Heft then testified in his defense.

{¶21} Heft testified that he had never been involved with a criminal investigation prior to this proceeding; that his wife and S.W.'s mother, Bridget Heft, suffered a stoke in 1999; that her stroke resulted in her having physical difficulties with her hand and some speech problems, but she had no mental disabilities; that S.W. never took care of the home and did not cook or clean; that, in fact, the family had issues with S.W. completing her assigned chores; that he and Bridget had a normal marital relationship, evidenced by the fact that Bridget had a son, Shawn, a year after she suffered the stroke; that his relationship with S.W. the first few years of his marriage to Bridget was "great"; that, as S.W. became a teenager, she became more challenging because she was argumentative and wanted to go out a lot; that he and Bridget expected S.W. to help out around

the house and to get a job for her extra spending money, but she refused; that S.W. would throw temper tantrums, scream, cry, and "have attitudes" (Id. at 254); that, on Christmas Eve in 2001, the family was in Canal Winchester, corroborated by a gas station receipt; that his mother, S.W.'s step-grandmother, Beatrice, lived at the residence and was agoraphobic, so she never left the home; that S.W. was not permitted to date boys he considered to be inappropriate, which made her angry; that S.W. was permitted to date a boy named Grant, and the family included him in several family get-togethers; that, on Father's Day in 2006, he and Bridget argued with S.W. about her behavior, and she then overdosed on pills; that S.W. reported to the hospital staff that she intentionally overdosed due to arguments with her parents over her boyfriend, but then later reported she had just accidentally taken too many pills; that, in July and August 2006, he went out of state on business, departing the end of "fair week", and returning several weeks later when he underwent surgery for blood clots; that he helped S.W. fill out her college entrance exam forms, college applications, and financial aid forms; that S.W. did not really help with the forms or pay the fees, which caused problems between the two of them; that, the day S.W. left the home, he returned from work and S.W. was instigating Shawn to run around the room, despite the fact that he had just had his tonsils out; that he became angry because he felt she had put Shawn's health at risk, and the two began to argue; that he told S.W. "you're 17

years old. You need to straighten up your attitude or find another place to live. We can't handle this anymore—or 18, I'm sorry" (Id. at 271); that S.W. chose to leave the home; and, that, several days later, he was arrested at work and learned of S.W.'s accusations of sexual abuse.

**{¶22}** On cross-examination, Heft testified that his income constituted the bulk of the household funds; that he did not know why S.W. would make false accusations against him, but speculated it was due to financial concerns, arguing, and the influence of her friends.

**{¶23}** Bridget Heft testified that she suffered a stroke in 1999; that her condition had improved over the years; that she continued to have physical difficulties with one hand, but had no mental problems; that she never saw Heft act inappropriately toward S.W. or touch her inappropriately; that S.W. never approached her with any accusations against Heft; that she drank four to six alcoholic beverages each evening; that Heft's mother and S.W.'s step-grandmother, Beatrice, lived in the household most of the time; that Beatrice was always in the home unless she took her to a doctors appointment or to a store; that she and Heft had a normal marital relationship; that she did all of the cooking, cleaning, and laundry in the home, and could not imagine S.W. saying that she did it; that, the day S.W. left the home, she had been throwing a ball across the room and telling Shawn to run to get it; that she told S.W. to stop making Shawn run;

that Heft came home and told S.W. not to have Shawn run because he recently had surgery; that Heft and S.W. then argued about her forms for college; that the argument culminated in Heft telling S.W., "you'll own up to the rules or you can get out" (Id. at 307); and, that S.W. then left the home.

{¶24} After the close of testimony, the jury returned verdicts of guilty on Counts Three and Four, finding Heft guilty of two counts of gross sexual imposition. The jury was unable to reach a verdict on Counts One and Two, which were consequently dismissed upon the State's motion.

{¶25} In April 2009, the trial court ordered Heft to serve a fifteen-month prison term on Count Three, and a fifteen-month prison term on Count Four, to be served consecutively. Additionally, the trial court classified Heft as a Tier I sexual offender.

{¶26} It is from his conviction and sentence that Heft appeals, presenting the following assignments of error for our review.

### *Assignment of Error No. I*

**OHIO REVISED CODE SECTION 2907.05 IS UNCONSTITUTIONAL AS IT IS APPLIED TO APPELLANT AND OTHERS SIMILARLY SITUATED BECAUSE IT IS VAGUE AND OVERBROAD AND CONFLICTS WITH THE REQUIREMENTS OF OHIO REVISED CODE SECTION 2907.06.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED WHEN IT ORDERED CONSECUTIVE SENTENCES.**

*Assignment of Error No. III*

**THE VERDICTS ON THE GROSS SEXUAL IMPOSITION COUNTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. IV*

**APPELLANT WAS PREJUDICED BY THE COURT'S HOWARD CHARGE TO THE JURY WHEN THE JURY INDICATED IT COULD NOT COME TO A VERDICT.**

*Assignment of Error No. V*

**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.**

*Assignment of Error No. VI*

**THE SECOND INDICTMENT WAS CONSTITUTIONALLY DEFICIENT AS IT WAS INTENTIONALLY VAGUE [SIC] THAT IT EFFECTIVELY DENIED APPELLANT THE ABILITY TO FORM A PROPER DEFENSE, EVEN THOUGH THE STATE PRESENTED EVIDENCE TO A SPECIFIC DATE DURING TRIAL WHICH WAS NEVER DISCLOSED THROUGH THE BILL OF PARTICULARS OR IN ANY SUBSEQUENT PLEADING.**

*Assignment of Error No. VII*

**APPELLANT DID NOT RECEIVE A FAIR TRIAL WHEN THE COURT PERMITTED THE INTRODUCTION OF EVIDENCE OF OTHER BAD ACTS, BY ALLOWING THE VICTIM TO TESTIFY IN VAGUE TERMS AS TO WHEN EACH OF THE CRIMES OCCURRED, ATTEMPTING TO**

**INCORPORATE ALLEGED MULTIPLE INCIDENTS TO PROVE ONE CERTAIN ACT AND THEN FAILED TO GIVE A LIMITING INSTRUCTION TO THE JURY.**

*Assignment of Error No. VIII*

**APPELLANT WAS DEPRIVED AFFECTIVE [SIC] ASSISTANCE OF COUNSEL WHEN COUNSEL [SIC] WHICH DEPRIVED APPELLANT A FAIR TRIAL**

{¶27} Due to the nature of Heft's assignments of error, we elect to address them in a different order than presented in his brief.

*Assignment of Error No. I*

{¶28} In his first assignment of error, Heft argues that R.C. 2907.05 is unconstitutional as applied to him because it is vague, overbroad, and conflicts with the requirements of R.C. 2907.06. Specifically, Heft contends that R.C. 2907.05 is unconstitutional because a lesser misdemeanor charge, sexual imposition in violation of R.C. 2907.06, requires corroboration. According to Heft, the General Assembly's requirement of a greater burden of evidence on this lesser charge renders R.C. 2907.05 unconstitutional, as it is a greater charge, yet requires no corroboration.

{¶29} Initially, we note that Heft failed to challenge the constitutionality of R.C. 2907.05 prior to or at trial. The Supreme Court of Ohio has held that, "'[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a

waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal.'" *State v. Rice*, 3d Dist. Nos. 1-02-15, 1-02-29, 1-02-30, 2002-Ohio-3951, ¶7, quoting *State v. Awan* (1986), 22 Ohio St.3d 120, syllabus, limited by *In re M.D.* (1988), 38 Ohio St.3d 149, syllabus. However, the waiver doctrine set forth by *Awan* is discretionary; thus, "even where waiver is clear, a reviewing court may consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it." *Rice*, 2002-Ohio-3951, at ¶7, citing *In re M.D.*, supra. The Supreme Court of Ohio has directed, however, that " "'discretion will not ordinarily be exercised to review such claims, where the right sought to be vindicated was in existence prior to or at the time of trial.'" " Id., quoting *State v. 1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 170-71, quoting *State v. Woodards* (1966), 6 Ohio St.2d 14, 21.

**{¶30}** We find that the constitutional issue Heft now argues was apparent at the time of trial, and, therefore, Heft has waived the issue on appeal.

**{¶31}** Accordingly, we overrule Heft's first assignment of error.

*Assignment of Error No. II*

**{¶32}** In his second assignment of error, Heft contends that the trial court erred when it ordered him to serve consecutive sentences. Specifically, Heft argues that the trial court erroneously found he lacked remorse on the basis that he

maintained his innocence, and that the trial court did not give appropriate weight to the fact that he had been employed all of his life and had led a law-abiding life. We disagree.

**{¶33}** An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Daughenbaugh*, 3d Dist. No. 16-07-07, 2007-Ohio-5774, ¶8, citing *State v. Carter*, 11th Dist. No. 2003-P-0007, 2004-Ohio-1181. A meaningful review allows the appellate court to modify or vacate a felony sentence and remand the matter to the trial court for resentencing if clear and convincing evidence shows the sentence was contrary to law or was not supported by the record. *Daughenbaugh*, supra, citing *Carter*, 2004-Ohio-1181, at ¶44; R.C. 2953.08(G).

**{¶34}** The Supreme Court of Ohio, in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, declared portions of the felony sentencing statutes to be unconstitutional, specifically those portions requiring judicial fact finding before imposition of sentences, pursuant to the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000), 530 U.S. 466; *Blakely v. Washington* (2004), 542 U.S. 296; and *United States v. Booker* (2005), 543 U.S. 220. Specifically, *Foster* held that "[t]rial courts [now] have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or

give their reasons for imposing maximum, consecutive, or more than the minimum sentences." 2006-Ohio-856, at paragraph seven of the syllabus.

{¶35} Furthermore, the Supreme Court of Ohio in *State v. Bates*, 118 Ohio St.3d 174, 2008-Ohio-1983, ¶18, held that "[t]he severance and excision of former R.C. 2929.14(E)(4) * * * by *Foster* * * * leaves no statute * * * to limit [the] trial court['s] discretion beyond the basic 'purposes and principles of sentencing' provision articulated and set forth in R.C. 2929.11 and 2929.12."

{¶36} Here, the trial court sentenced Heft to two consecutive fifteen-month prison terms for his gross sexual imposition convictions, fourth degree felonies. Under R.C. 2929.14(A)(4), the trial court had discretion to sentence Heft to a prison term ranging from six to eighteen months. Thus, the trial court imposed sentences within the statutory range. Further, although the trial court ordered Heft to serve his sentences consecutively, under *Foster*, this was within the trial court's discretion and the trial court was not required to give its reasons for doing so.

{¶37} Accordingly, we overrule Heft's second assignment of error.

*Assignment of Error No. V*

{¶38} In his fifth assignment of error, Heft argues that he was denied his constitutional right to a speedy trial. Specifically, Heft contends that the matter came for trial 606[2] days after his arrest, and, although he filed numerous motions

---

[2] This Court calculated the time for speedy trial purposes from Heft's arrest until trial as 578 days, as set forth in the chart below.

which tolled the speedy trial time for the first indictment, the State still failed to try him within 270 days of the date of his arrest. We disagree.

{¶39} "Our standard of review upon an appeal raising a speedy trial issue is to count the expired days as directed by R.C. 2945.71, et seq." *State v. King*, 3d Dist. No. 9-06-18, 2007-Ohio-335, ¶30, citing *State v. DePue* (1994), 96 Ohio App.3d 513, 516. If any ambiguity exists, this court will construe the record in the defendant's favor. Id., citing *State v. Mays* (1996), 108 Ohio App.3d 598, 609.

{¶40} "Both the United States and Ohio Constitutions guarantee a criminal defendant the right to a speedy trial." *State v. Masters*, 172 Ohio App.3d 666, 2007-Ohio-4229, ¶9, citing *State v. Baker*, 78 Ohio St.3d 108, 110, 1997-Ohio-229. In addition, Ohio statutes set forth specific time requirements necessary for compliance with the speedy-trial guarantee. The applicable statutory speedy-trial provision, R.C. 2945.71(C)(2), provides that "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest."

{¶41} Additionally, R.C. 2945.73(B) provides that "[u]pon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." Both R.C. 2945.71 and 2945.73 are mandatory, and strict compliance is required by the State. *King*, 2007-Ohio-335,

at ¶32, citing *State v. Pudlock* (1975), 44 Ohio St.2d 104, 105. Therefore, when a criminal defendant shows that he was not brought to trial within the proper period, the burden shifts to the State to demonstrate that sufficient time was tolled or extended under the statute. *Masters*, 2007-Ohio-4229, at ¶10, citing *State v. Butcher* (1986), 27 Ohio St.3d 28, 31.

{¶42} Time extensions are permitted in limited circumstances under R.C. 2945.72, including periods of delay "necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused[.]" R.C. 2945.72(E). Further, the Supreme Court of Ohio has held that "the accused may waive his constitutional right to a speedy trial, provided such waiver is knowingly and voluntarily made." *State v. O'Brien* (1987), 34 Ohio St.3d 7, citing *Barker v. Wingo* (1972), 407 U.S. 514, 529.

{¶43} The statutory time period begins to run on the date the defendant is arrested; however, the date of arrest is not counted when computing the time period. *Masters*, 2007-Ohio-4229, at ¶12, citing *State v. Stewart* (1998), 12th Dist. No. CA98-03-021, 1998 WL 640909. Additionally, the triple-count statute, R.C. 2945.71(E), provides that, for computation purposes, each day an accused spends in jail in lieu of bond on the pending charge shall count as three days. *State v. Euton*, 3d Dist. No. 2-06-35, 2007-Ohio-6704, ¶24.

{¶44} The Supreme Court of Ohio has specifically addressed speedy trial situations in which an original indictment is dismissed and a second indictment is later filed. In *State v. Broughton*, the Supreme Court held that, "[f]or purposes of computing how much time has run against the state under R.C. 2945.71 et seq., the time period between the dismissal without prejudice of an original indictment and the filing of a subsequent indictment, premised upon the same facts as alleged in the original indictment, shall not be counted unless the defendant is held in jail or released on bail pursuant to Crim.R. 12(I)."[3] 62 Ohio St.3d 253, at paragraph one of the syllabus. Further, *Broughton* noted that solely because a defendant may have suffered anxiety or apprehension during the period between the dismissal of the first indictment and reindictment does not mean the time period must be counted and attributed to the State for speedy trial purposes. 62 Ohio St.3d at 258, citing *State v. Bonarrigo* (1980), 62 Ohio St.2d 7, 11, citing *United States v. Hillegas* (C.A.2, 1978), 578 F.2d 453, 457-58. See, also, *State v. Gearhart*, 5th Dist. No. 99CA107, 2000 WL 329670; *State v. Tornstrom*, 8th Dist. No. 72898, 1998 WL 811314.

{¶45} Appellate districts interpreting *Broughton* have subsequently found that a trial court's failure to explicitly declare that a defendant is released from bail

---

[3] Former Crim.R. 12(I) is now Crim.R. 12(J), and provides, in pertinent part: "(J) Effect of determination: If the court grants a motion to dismiss based on a defect in the institution of the prosecution or in the indictment, information, or complaint, it may also order that the defendant be held in custody or that the defendant's bail be continued for a specified time not exceeding fourteen days, pending the filing of a new indictment, information, or complaint. "

in the entry of dismissal pursuant to Crim.R. 48(A) does not necessarily mean that the defendant's bail is continued pursuant to Crim.R. 12(J). See *State v. Buck*, 4th Dist. No. 98CA2438, 1999 WL 253485; *State v. Bieser*, 5th Dist. No. 06CA00045, 2007-Ohio-1960. In *Buck*, the Fourth Appellate District found no evidence in the record indicating that the trial court continued the defendant's bail following the dismissal of the original indictment pursuant to Crim.R. 12(J). Further, the appellate court noted that the defendant's recognizance form required him to comply with the bond terms "until such case is finally disposed of," and concluded that once the criminal charges were dismissed, the bail obligations were also extinguished. Accordingly, the appellate court concluded that the trial court had intended for the defendant's bail obligation to terminate upon dismissal of the indictment and, pursuant to *Broughton*, found that the time period between the dismissal and the refiling was tolled.

{¶46} In the case before us, Heft was arrested on July 24, 2007, and spent two days in jail, before being released on bond awaiting trial. The matter did not come to trial until February 18, 2009, 578 days after his arrest. Thus, at first observation, it appears Heft's speedy trial rights were violated.

{¶47} The primary issue Heft and the State dispute as to allocation of days for speedy trial purposes is whether the time period between the dismissal of the first indictment and service of the second indictment is attributable to the State

because Heft was under the "strain" of the impending second indictment and because nothing in the record demonstrates his bond was released from the first indictment. As in *Buck*, supra, neither Heft nor the State argue that Heft's bail was continued pursuant to the former Crim.R. 12(J), nor does the record suggest that the trial court continued Heft's bail pursuant to Crim.R. 12(J). Additionally, we reject Heft's argument that the time should not be tolled, but counted and attributed to the State, because he was under the strain of a second indictment. The Supreme Court expressly rejected this argument in *Broughton*. See *Broughton*, 62 Ohio St.3d at 258. Accordingly, we find that, as in *Buck* and *Broughton*, the time period between the dismissal of the first indictment and service of the second indictment was tolled and is not attributable to either party.

{¶48} Considering the pertinent events in the case before us, we find the tolling events and days attributable to Heft and the State to be allocated as follows:

| Dates | Events | Days | Days Attributed to Defendant | Days Attributed to State |
|---|---|---|---|---|
| 7-24-07 to 7-26-07 | **Arrest of Defendant**<br><br>**Defendant released on own recognizance bond** | 6 | 0 | 6 (2 days, triple counted) |
| 7-27-07 to 12-16-07 | | 143 | 0 | 143 |
| 12-17-07 to 2-04-08 | **Defendant's motion to continue trial (rescheduled for 2-21-08)** | 50 | 50 | 0 |
| 2-05-08 to 4-28-08 | **Defendant's motion to continue (rescheduled for 4-** | 84 | 84 | 0 |

| | | | | |
|---|---|---|---|---|
| | **29-08)** **State files motion to dismiss** | | | |
| 4-28-08 to 5-15-08 | **State's motion to dismiss pending (granted 4-28-08, but not journalized until 5-15-08)** | 17 | | 17 |
| 5-15-08 to 7-07-08 | **No charges pending** | 53 | 0 | 0 |
| 7-08-08 | **Second indictment issued** | 1 | 0 | 0 |
| 7-09-08 to 8-17-08 | **Defendant served summons on second indictment** | 40 | 0 | 40 |
| 8-18-08 to 9-03-08 | **Defendant's motion to dismiss** **Court denies Defendant's motion to dismiss** | 17 | 17 | 0 |
| 9-04-08 to 10-19-08 | | 46 | 0 | 46 |
| 10-20-08 to 2-18-09 | **Defendant's motion to continue (trial rescheduled for 2-18-09)** **Jury trial commences** | 121 | 121 | |
| | **TOTAL** | 578 | 272 | 252 |

{¶48} As illustrated above, the total number of days allocated to the State is below the 270 day limit, and Heft's speedy trial argument fails.

{¶49} Accordingly, we overrule Heft's fifth assignment of error.

*Assignment of Error No. VI*

{¶50} In his sixth assignment of error, Heft contends that the second indictment was constitutionally deficient as it was intentionally vague, and that it effectively denied him the ability to form a proper defense, even though the State presented evidence of a specific date during the trial which was never disclosed through the bill of particulars or any other pleading. Specifically, Heft argues that

it is unascertainable from the face of the indictment whether only two acts of gross sexual imposition were alleged, or whether the State was relying on testimony about many more acts, and merging these instances into one act during each time period. We disagree that the second indictment was constitutionally deficient.

{¶49} Initially, we note that Heft failed to object to the indictment prior to trial. As such, he has waived all but plain error. See *State v. Rohrbaugh*, 178 Ohio App.3d 211, 2008-Ohio-4781, ¶20; Crim.R. 12(C).

{¶50} A criminal indictment is sufficient only if it "(1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Valentine v. Konteh* (C.A.6, 2005), 395 F.3d 626, 631. Additionally, courts have found that:

> **[w]here such crimes constitute sexual offenses against children, indictments need not state with specificity the dates of the alleged abuse, so long as the prosecution establishes that the offense was committed within the time frame alleged. This is partly due to the fact that the specific date and time of the offenses are not elements of the crimes charged. Moreover, many child victims are unable to remember exact dates and times, particularly where the crimes involved a repeated course of conduct over an extended period of time. The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse.**

*State v. Yaacov*, 8th Dist. No. 86674, 2006-Ohio-5321 (internal citations omitted); see, also, *State v. Mundy* (1994), 99 Ohio App.3d 275.

{¶51} In *Valentine*, supra, a defendant was convicted of twenty counts of rape, based on twenty identically worded indictments, and twenty counts of felonious sexual penetration, based on twenty identically worded indictments. The federal appeals court reversed all but one of the rape convictions and all but one of the sexual penetration convictions, finding that the prosecution "did not distinguish the factual bases of these charges in the indictment, in the bill of particulars, or even at trial." 395 F.3d at 628. Consequently, the federal court found that the defendant "had notice that he was charged with two separate crimes during the period of time specified in the indictment. But he had no way to otherwise identify what he was to defend against in the repetitive counts and no way to determine what charges of a similar nature could be brought against him in the future if he were re-indicted." 395 F.3d at 628-29. Noting the lessened requirement of specificity in regards to date and time for indictments for sexual offenses against children, the court distinguished Valentine's case, stating that:

> **[t]he problem in this case is not the fact that the prosecution did not provide the defendant with exact times and places. If there had been singular counts of each offense, the lack of particularity would not have presented the same problem. Instead, the problem is that within each set of 20 counts, there are absolutely no distinctions made. [The defendant] was prosecuted for two criminal acts that occurred twenty times each, rather than for forty separate criminal acts. In its charges and in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place.**

395 F.3d at 632. Additionally, *Valentine* noted that this situation presented double jeopardy concerns because it was unascertainable whether such a vague indictment would preclude future prosecution for incidents with the same victim during the same time frame. 395 F.3d at 635.

{¶52} Here, Heft's July 2008 indictment reflects that the grand jury found the following:

**COUNT I.**

**Brian L. Heft, between the dates of July 1, 2006 and August 31, 2006, at the county of Logan aforesaid, purposely engaged in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force, in violation of Ohio Revised Code Section 2907.02(A)(2), Rape, a felony of the first degree.**

**COUNT II.**

**Brian L. Heft, between the dates of July 1, 2006 and August 31, 2006, at the county of Logan aforesaid, knowingly engaged in sexual conduct with another, not the spouse of the offender when the offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person, in violation of Ohio Revised Code §2907.03(A)(5), Sexual Battery, a felony of the third degree.**

**COUNT III.**

**Brian L. Heft, between the dates of January 19, 2001 and June 2, 2004, at the county of Logan aforesaid, purposely had sexual contact with another, not the spouse of the offender; purposely caused another, not the spouse of the offender, to have sexual contact with the offender; or purposely caused two or more other persons to have sexual contact when the offender purposely compels the other person, or one of the other persons,**

**to submit by force or threat of force, in violation of Ohio Revised Code §2907.05(A)(1), Gross Sexual Imposition, a felony of the fourth degree.**

**COUNT IV.**

**Brian L. heft, between the dates of June 3, 2004 and July 21, 2007, at the county of Logan aforesaid, purposely had sexual contact with another, not the spouse of the offender; purposely caused another, not the spouse of the offender, to have sexual contact with the offender; or purposely caused two or more other persons to have sexual contact when the offender purposely compels the other person, or one of the other persons, to submit by force or threat of force, in violation of Ohio Revised Code R.C. §2907.05(A)(1), Gross Sexual Imposition, a felony of the fourth degree.**

{¶53} We note that Heft filed no request for a bill of particulars as to this second indictment, nor did the State file one. Nevertheless, we find the case before us to be distinguishable from the situation presented in *Valentine* because the indictment provided Heft with adequate notice of the offenses as well as protection from double jeopardy.

{¶54} Here, while the indictment does not specifically enumerate every instance of sexual contact the victim alleged over the six-year period, it sets forth a single representative count of gross sexual imposition for each household in which the family lived during the six-year period. Additionally, the indictment sets forth one count for the rape instance the victim alleged, and one count for the instance of sexual battery the victim alleged. We find that the indictment sufficiently connected each charge to a specific incident, providing Heft with adequate notice

of the offenses against which he must defend. Further, it is clear that the jury differentiated between the incidents, as it acquitted Heft of the rape and sexual battery counts. See *State v. Meador*, 12th Dist. No. CA2008-03-042, 2009-Ohio-2195, ¶12, citing *Valentine*, 395 F.3d at 634.

{¶55} Additionally, we find that the indictment protects Heft against double jeopardy because, unlike the defective indictment at issue in *Valentine*, Heft's indictment differentiated the counts by the type of offense alleged and the time period. As the counts were differentiated, Heft is protected against a subsequent prosecution for the same conduct. See *State v. Van Voorhis*, 3d Dist. No. 8-07-23, 2008-Ohio-3224, ¶44.

{¶56} Accordingly, we overrule Heft's sixth assignment of error.

*Assignment of Error No. VII*

{¶57} In his seventh assignment of error, Heft argues that he did not receive a fair trial because the trial court permitted the introduction of evidence of other unindicted offenses by permitting the victim to testify in vague terms as to when each of the incidents occurred. Specifically, Heft contends that S.W. was permitted to testify about multiple occasions of alleged abuse for which he was not indicted, which he contends constituted prohibited "bad acts" evidence in violation of Evid.R. 404(B). We disagree.

{¶58} Evid.R. 404(B) governs character evidence and provides that:

**Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

{¶59} The exceptions allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, paragraph one of the syllabus. Nevertheless, the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Issa*, 93 Ohio St.3d 49, 64, 2001-Ohio-1290. Thus, our inquiry is confined to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issue about which Heft complains. *State v. Barnes*, 94 Ohio St.3d 21, 23, 2002-Ohio-68.

{¶60} Regarding the applicability to Evid.R. 404(B) to course-of-conduct sexual abuse cases, several courts have held that extensive presentation of evidence of other acts for which a defendant was not indicted can become so pervasive as to deny that defendant a fair trial. See *State v. Shaw*, 2d Dist. No. 21880, 2008-Ohio-1317; *Meador*, supra. Compare *State v. Molen*, 2d Dist. No. 21941, 2008-Ohio-6237.

{¶61} In *Shaw*, supra, a defendant was indicted for fifteen counts of rape and ten counts of sexual battery against three different victims. At trial, the State elicited testimony about several specific instances of abuse, in addition to "extensive" testimony from each victim that she was abused multiple times each week for several years. On appeal, the State argued that the testimony about the unindicted offenses was admissible under Evid.R. 404(B) because it demonstrated why the victims tolerated the abuse. However, the appellate court found that the only justification offered at trial for the admission of this testimony was that the prosecutor needed to speak to the victims "about what happened during these times so [she could] move on to what the next incident will be. There [were] so many incidents." 2008-Ohio-1317, at ¶12. The Appellate Court disagreed and reversed the defendant's convictions, finding that this cursory explanation did not fall into an exception under Evid.R. 404(B), and concluded that the "extensive" and "pervasive" testimony about other acts had denied the defendant a fair trial. 2008-Ohio-1317, at ¶14.

{¶62} In *Meador*, a defendant was charged with three counts of rape against one victim, and with other sexual offenses against the victim's cousin. Although the cases were severed for trial, the trial court permitted several witnesses to testify at the victim's trial about an unelaborated "incident" with the cousin to put the offenses at issue within a time frame. However, the testimony

elicited clearly insinuated that the "incident" was sexual abuse, and one witness actually stated that the incident was "touching * * * inappropriately." 2009-Ohio-2195, at ¶59. Further, the trial court failed to give the jury a curative or limiting instruction. On appeal, the Twelfth Appellate District concluded that the trial court committed plain error in permitting this testimony, finding that "it was not offered for an enumerated purpose," and that the pervasiveness of the improper references were "so unfairly prejudicial that exclusion would be necessary under Evid.R. 403(A)." 2009-Ohio-2195, at ¶75.

{¶63} Here, S.W. stated at trial that Heft sexually abused her on "multiple occasions" (Id. at 167); that, when the family moved into the Highview residence, there were "many" incidents of sexual abuse (Id. at 176); that, during these incidents, Heft would "always come in – well, most of the time it was usually pretty much every other day is what it felt like to [her]" (Id.); that Heft would "just come in while [she] was sleeping and take off [her] covers, and sometimes he would lay [sic] in bed and he would put his arm around [her] and start touching [her] breasts" (Id.). Initially, we note that S.W.'s testimony about "multiple occasions" of abuse was not necessarily concerning other acts, as Heft was indicted and tried for multiple sexual abuse offenses. Additionally, we do not find that these minimal, vague references reached the extensive and pervasive nature of the testimony at issue in *Shaw* and *Meador*.

{¶64} Accordingly, we overrule Heft's seventh assignment of error.

*Assignment of Error No. VIII*

{¶65} In his eighth assignment of error, Heft contends that he was deprived of effective assistance of counsel. Specifically, Heft argues that trial counsel was ineffective for failing to call as a witness S.W.'s step-grandmother, who lived in the Heft household; for failing to admit into evidence documents from the hospital showing S.W.'s stated reasons for overdosing on pills; for failing to object to hearsay statements made by Victoria Early; for failing to bring to the trial court's attention that the jury could be overheard discussing sentencing during deliberations; and, for failing to bring to the trial court's attention that Victoria Early's mother, Bridget Early, who sat by S.W. during sentencing, was the Logan County Law Librarian, who allegedly worked closely with the trial judge on a daily basis, and could have influenced the judge's sentencing decision and his ruling on Heft's motions for acquittal. We disagree that trial counsel was ineffective.

{¶66} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio

St.3d 136, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, superseded by constitutional amendment on other grounds as recognized by *State v. Smith*, 80 Ohio St.3d 89, 103, 1997-Ohio-355.

{¶67} Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone* (1989), 2d Dist. No. 10564, 1989 WL 150798. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id., quoting *Smith v. Murray* (1986), 477 U.S. 527.

{¶68} Heft first argues that trial counsel was ineffective for failing to call as a witness S.W.'s step-grandmother, who lived in the household. This Court has previously held that "[t]he decision whether to call a witness is 'within the rubric of trial strategy and will not be second-guessed by a reviewing court.'" *In re Walker*, 3d Dist. Nos. 5-05-22 & 5-05-23, 2005 WL 3359125, ¶14, quoting *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396. Here, the record provides no

evidence supporting a claim that declining to call S.W.'s step-grandmother as a witness was not sound trial strategy. Additionally, although Heft insinuates that S.W.'s step-grandmother's testimony would have been in his favor, this claim is unsubstantiated by the record, and thus, he has demonstrated no reasonable probability that calling her would have changed the outcome of the proceeding. Therefore, trial counsel was not ineffective for declining to call S.W.'s step-grandmother as a witness. See *State v. Martin*, 2d Dist. No. 20610, 2005-Ohio-1369, ¶19.

{¶69} Next, Heft argues that trial counsel was ineffective for failing to object to Victoria Early's hearsay testimony that S.W. told her and Bridget Early that "she had something that she needed to tell [them] and was just repeating over and over again that she could never go back home" (trial tr., p. 120). However, admission of hearsay evidence may be harmless where the declarant was cross-examined on the same matters and the hearsay evidence was cumulative in nature. See *State v. Abdullah*, 10th Dist. No. 05AP-1316, 2006-Ohio-5412, ¶38; *State v. Tomlinson* (1986), 33 Ohio App.3d 278, 281. Here, S.W. testified during direct examination that she told Victoria and Bridget Early that Heft had abused her, and was subject to cross-examination on these statements. Accordingly, admission of these statements was harmless, and we do not find that, but for their admission,

there was a reasonable probability that the outcome of trial would have been otherwise.

**{¶70}** Finally, Heft contends that trial counsel was ineffective for failing to admit into evidence S.W.'s hospital records; for failing to bring to the trial court's attention that the jury could be overheard discussing sentencing during deliberations; and, for failing to bring to the trial court's attention that Bridget Early was the Logan County Law Librarian and could have influenced the judge.

**{¶71}** It is well-settled that an appellate court may only consider evidence that was before the trial court in the proceeding being appealed from and was made part of the appellate record. *Bank One Lima, N.A. v. Altenburger* (1992), 84 Ohio App.3d 250, 256, citing *Paulin v. Midland Mut. Life Ins. Co.* (1974), 37 Ohio St.2d 109, 112. Thus, an appellate court may not make a decision based upon allegations founded upon facts outside of the record. App.R. 9(A); *State v. Ishmail* (1978), 54 Ohio St.2d 402. Accordingly, we cannot consider Heft's arguments, as nothing in the record demonstrates that this evidence or these alleged issues were before the trial court in the current proceeding being appealed.

**{¶72}** Accordingly, we overrule Heft's eighth assignment of error.

*Assignment of Error No. IV*

**{¶73}** In his fourth assignment of error, Heft contends that he was prejudiced by the trial court's giving of the *Howard* charge to the jury after it

indicated that it could not reach a verdict. Specifically, Heft argues that the *Howard* charge favors conviction over acquittal; that the trial court failed to remind the jurors that Heft was entitled to the benefit of any doubt; and, that the trial court did not determine the numerical division before giving the instruction. We disagree that Heft was prejudiced by the giving of the *Howard* charge.

{¶74} Jury instructions are within the trial court's discretion. *State v. Guster* (1981), 66 Ohio St.2d 266, 271. Accordingly, a trial court's decision whether to give an instruction pursuant to *State v. Howard* (1989), 42 Ohio St.3d 18, is within its discretion, and this Court will not reverse that decision absent an abuse of discretion. *State v. Thomas*, 2d Dist. No. 2000-CA-43, 2001-Ohio-1353, citing *State v. King*, 7th Dist. No. 95 CA 163, 2000 WL 309393. An abuse of discretion connotes that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶75} In *Howard*, the Supreme Court of Ohio expressly approved of the following supplemental instruction to be given to juries deadlocked on the question of conviction or acquittal:

> **The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the**

**case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.**

42 Ohio St.3d at 25-26. We note that virtually the same instruction has been adopted by the Ohio Jury Instructions. See Ohio Jury Instructions (2008), Section CR 429.09(2).

{¶76} In formulating the *Howard* instruction, the Supreme Court of Ohio was "mindful of several competing factors when giving a supplemental instruction to a divided jury and attempted to accommodate those factors." *State v. Troglin*, 3d Dist. No. 14-04-41, 2005-Ohio-6562, ¶46, citing *Howard*, 42 Ohio St.3d at 23-24. Particularly, the instruction may not isolate jurors holding the minority position and direct them to reconsider their positions. Id., citing *Howard*, 42 Ohio St.3d at 24. Additionally, the instruction may not coerce the jury by stressing that it must reach a verdict. Id. Moreover, through the instruction, the trial judge must

remind the jury of its purpose—to reach a unanimous decision. Id. Finally, the instruction must be balanced and neutral, ask all of the jurors to reconsider their opinions, and encourage a verdict. Id., citing *Howard*, 42 Ohio St.3d at 24-25.

{¶77} Here, the trial court appropriately delivered the *Howard* instruction to the jury after it indicated that it could not reach a decision. We find no merit to Heft's argument that the *Howard* instruction is prejudicial and favors conviction over acquittal. The Supreme Court of Ohio and Ohio Jury Instructions have expressly approved of this instruction, finding it to be balanced, neutral, and uncoercive. Heft's arguments do not persuade us to the contrary.

{¶78} Accordingly, we overrule Heft's fourth assignment of error.

*Assignment of Error No. III*

{¶79} In his third assignment of error, Heft argues that his convictions for gross sexual imposition were against the manifest weight of the evidence. Specifically, Heft contends that the entire case was based on S.W.'s unverified statements, and that S.W. was not credible because she lied to hospital staff about her attempted suicide, was inconsistent concerning the time frame during which she revealed the alleged abuse to Victoria and Bridget Early, and was mistaken about which year the Christmas Eve incident took place. Additionally, although not separately set forth, Heft argues that there was insufficient evidence to convict him of gross sexual imposition because the element of force was not demonstrated

pertaining to Count Three of the indictment. We disagree that the verdicts were against the manifest weight of the evidence, or that there was insufficient evidence to convict Heft of Count Three.

{¶80} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id. Finally, we emphasize that the trial court is in the best position to weigh witness credibility, as it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *In re Jane Doe I* (1991), 57 Ohio St.3d 135, 138; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80.

{¶81} Here, Heft is correct in his assertions that S.W.'s accusations were not corroborated by physical evidence; that her testimony had some

inconsistencies; and, that she admitted she had lied to hospital staff. However, despite the lack of physical corroboration, inconsistencies, and S.W.'s admission to lying on that occasion, S.W. maintained that Heft had sexually abused her, which the jury apparently believed. We cannot find that the evidence weighs so heavily against the conviction to warrant reversal, particularly given that the jury was in the best position to weigh the credibility of the witnesses' testimonies.

{¶82} We next turn to whether insufficient evidence was presented to convict Heft of Count Three. When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 392, 2005-Ohio-2282, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra. Sufficiency is a test of adequacy, *Thompkins*, supra, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶83} Here, Heft contends that insufficient evidence was presented to demonstrate that he used force to commit gross sexual imposition as alleged in Count Three. Specifically, Heft contends that S.W. only testified that Heft

approached her in the Reservoir Road residence, kissed her, that she walked away and lay on her bed, and that he came over and kissed her again. Heft contends that there was no evidence that he used any sort of physical force or that he threatened her.

{¶84} Heft was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1), which provides, in pertinent part:

**(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**

**(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.**

{¶85} The Revised Code defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D). The Supreme Court of Ohio has addressed the issue of "force or threat of force" several times in the context of the rape statute, R.C. 2907.02. In *State v. Eskridge* (1988), 38 Ohio St.3d 56, the Court stated that, under R.C. 2907.02, the amount of force necessary to commit the offense "depends upon the age, size and strength of the parties and their relation to each other," 38 Ohio St.3d 56, at paragraph one of the syllabus, and that "' * * * [f]orce need not be overt and physically brutal, but can be subtle and

-44-

psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" 38 Ohio St.3d at 58-59, quoting *State v. Fowler* (1985), 27 Ohio App.3d 149, 154; see, also, *State v. Byrd*, 8th Dist. No. 82145, 2003-Ohio-3958, ¶26. Finally, the Court observed that "'[s]exual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.'" Id., quoting *State v. Etheridge* (1987), 319 N.C. 34, 47, 352 S.E.2d 673, 681.

**{¶86}** Here, Count Three indicted Heft for the incident occurring when the family resided at Reservoir Road from January 2001 until June 2004. On this occasion, S.W. testified that Heft came into her room, pulled her pants and underwear down, and attempted to kiss her near her vagina; that she pulled up her pants and underwear and lied down on her bed; that Heft came back into her room, pulled her covers off, and began kissing her body; that she attempted to keep her pants up, but Heft continued to kiss her and "succeeded in everything that he tried" (trial tr., p. 172); that she did not tell anyone about the incident because Heft threatened that, if anything happened to him, her mother and brother would be

"out on the streets" (Id. at 174); and, that she took Heft's threats seriously because he was manipulative and controlling, and she was afraid of him. Additionally, S.W. testified that Heft was her stepfather from the time she was two years old, and that he was the only father figure she had ever known.

{¶87} We find that, from S.W.'s testimony, a jury could reasonably conclude that she resisted Heft's actions when he kissed her by attempting to keep her pants up, and that he physically and psychologically forced her to submit, particularly given their parent-child relationship and Heft's control over her. See *Eskridge*, supra. Thus, we find that sufficient evidence was heard to demonstrate that Heft used force to commit gross sexual imposition as alleged in Count Three.

{¶88} Accordingly, we overrule Heft's third assignment of error.

{¶89} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**