[Cite as *State v. Carr*, 2012-Ohio-1679.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 14-11-20

    v.

MICHAEL JEROME CARR,           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 11-CR-0045

**Judgment Affirmed**

Date of Decision: April 16, 2012

APPEARANCES:

    *Alison Boggs* for Appellant

    *David W. Phillips and Terry L. Hord* for Appellee

Case No. 14-11-20

**SHAW, P.J.**

{¶1} Defendant-appellant Michael J. Carr ("Carr") appeals the September 13, 2011 judgment of the Union County Court of Common Pleas sentencing him to six years in prison for Burglary in violation of R.C. 2911.12(A)(2), a felony of the second degree, and six months for Assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.

{¶2} On March 24, 2011 Carr was indicted by a Union County Grand Jury on four counts: Aggravated Robbery in violation of R.C. 2911.01(A)(3), a felony of the first degree, Robbery in violation of R.C. 2911.02(A)(3), a felony of the third degree, Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree, and Burglary in violation of R.C. 2911.12(A)(2), a felony of the second degree.

{¶3} The charges arose out of an incident occurring February 25, 2011 in which Carr came to the house where his on-again-off-again girlfriend/mother of his two children, Kaitlyn Davis ("Davis"), lived with her sister, Kelsea Blanchard ("Kelsea"), and Kelsea's boyfriend Steven Rutheford ("Rutheford"). Carr regularly came to the house to watch his and Davis' children during daytime hours while the rest of the household slept as they were on a third shift working schedule.

-2-

{¶4} On February 25, 2011, Carr woke up Davis and asked her to go downstairs and wake up her sister Kelsea, which she did. When Davis woke Kelsea up, Kelsea came out of the room she shared with Rutheford and got into an argument with Carr in the hallway over whether Rutheford and Kelsea owed Carr money.

{¶5} Angry and upset about the argument, Kelsea went back into her bedroom, closed the door and woke up Rutheford to inform him of what was happening. Carr walked into the bedroom and continued the argument. Kelsea then told Carr to get out of the house. Carr left the bedroom and Kelsea shut the door, barring it with her body to prevent his reentry as the door did not latch properly. Subsequently Carr forced his way back into the room, knocking Kelsea back into a chair, and continued the argument with Kelsea. Then, Carr reached around Kelsea who was standing in front of him and punched Rutheford in the face several times. Next, Carr went into Kelsea and Rutheford's closet, got into a shoe-box where the couple was saving "emergency funds" and took the money that was inside. Carr left the residence shortly thereafter.[1]

{¶6} On August 8, 2011, a jury trial was held wherein Carr was found guilty of Burglary in violation of R.C. 2911.12(A)(2), a felony of the second

---

[1] Although in some dispute at trial, this course of events follows the testimony of Davis, Kelsea, and parts of the testimony of Rutheford from the trial held on August 8, 2011.

degree, and Assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.[2]  Carr was found not guilty of the remaining charges.

{¶7} On September 13, 2011 Carr was sentenced to six years imprisonment on the Burglary charge and six months imprisonment on the Assault charge with those sentences to be served concurrently.  It is from this judgment that Carr appeals asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR I**

**THE JURY'S VERDICT FOR BURGLARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR II**

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT INSTRUCTED THE JURY TO DISREGARD THE PORTION OF KELSEA BLANCHARD'S TESTIMONY REGARDING PRIOR FALSE ACCUSATIONS, THEREBY PREJUDICING APPELLANT.**

*First Assignment of Error*

{¶8} In his first assignment of error, Carr argues that his Burglary conviction is against the manifest weight of the evidence.[3]  Specifically, Carr maintains that the State failed to prove the element of trespass.  Carr claims that since he was a regular "welcome" visitor to the victims' household and that he was never asked to leave by any of the "legal" tenants he could not have committed a trespass.  Carr argues that he could come and go as he pleased from the residence

---

[2] The conviction on Assault came as a lesser-included offense of the Felonious Assault charge.
[3] Carr's conviction for misdemeanor assault from this case is not being challenged on appeal.

and was not restricted from any particular portion of the house. Further, Carr argues that he was not convicted of a theft offense which Carr characterizes as an essential element of burglary.[4]

{¶9} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶ 30, citing *State v. Martin*, 20 Ohio App.3d 172 (1983); *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id*.

{¶10} Carr was indicted for, and convicted of, Burglary in violation of R.C. 2911.12(A)(2) which reads

> **(A) No person, by force, stealth, or deception, shall do any of the following:**
>
> * * *

---

[4] This is an improper characterization of the offense Carr was charged with under R.C. 2911.12(A)(2).

**(2)   Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]**

**{¶11}** Carr makes the argument that the trespass element of Burglary was lacking in his case.  Criminal trespass is defined in R.C. 2911.21 as

**(A)   No person, without privilege to do so, shall do any of the following:**

**(1)   Knowingly enter or remain on the land or premises of another;**

**(2)   Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard;**

**(3)   Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access;**

**(4)   Being on the land or premises of another, negligently fail or refuse to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either.**

**{¶12}** Davis was leasing the apartment of the incident in question at 658 Allenby Drive in Marysville along with Rutheford, the boyfriend of Davis' sister

Kelsea. Kelsea also lived in the residence that was leased by her sister Davis and her boyfriend Rutheford, sharing Rutheford's bedroom. Kelsea was listed as an occupant on the lease. (State's Ex. 6).

{¶13} Both Davis and Rutheford testified that they worked third shift at the time of this incident and regularly slept during daytime hours.[5] Because of this, someone was needed to watch Davis and Carr's children. Carr occasionally came over and watched the children in the apartment while the members of the household slept. Kelsea and Rutheford acknowledged that Carr was allowed to let himself in.

{¶14} On the date of the incident, Carr was watching the children while the others slept. Davis testified that around 1:30 p.m. Carr came into her bedroom, woke her up and asked Davis to wake up her sister Kelsea who was asleep downstairs in her bedroom with Rutheford. (Tr. at 176). Davis testified that she went downstairs and woke up Kelsea and that she then left the apartment to go to the store with the children. (Tr. at 177).

{¶15} Kelsea testified that after Davis woke her up she got into an argument with Carr in the "hallway * * * towards [her] bedroom." (Tr. at 90). Kelsea testified that Carr claimed Rutheford and Kelsea owed Carr money for rent that Carr had lent them. (Tr. at 89-90). Kelsea and Rutheford disputed that they

---

[5] While Kelsea does not testify that she worked third shift, she did testify that she stayed up nights to talk to Rutheford on his breaks at work and thus operated on the same schedule.

owed Carr money, but Rutheford acknowledged that he had at one time borrowed money from Carr, claiming that he had paid it back. (Tr. at 118).

{¶16} Kelsea testified that she was angry and upset due to the argument with Carr so she "walked away from it," went back into the bedroom she shared with Rutheford, and shut the door. (Tr. at 64). Kelsea testified that she woke up Rutheford, informed him of what was going on and asked him what she was supposed to do because Carr was yelling at her. (Tr. at 65).

{¶17} Kelsea testified that Carr then came into the bedroom and continued the argument. (Tr. at 66). She testified that she told Carr to "get out of [her] room" and shut him out of the bedroom. (Tr. at 66-67). This time, when she shut the door, Kelsea testified that she "leaned [her] body against it so [Carr] could not come back in because [her] door does not close all the way * * * [s]o [she] had to put her body against it to keep it closed." (Tr. at 67).

{¶18} Then, she testified that

**[Carr] came rushing into my door, pushing it open with all his strength. Made me fly across the room into a chair. Made me drop. And then * * * [Carr] * * * [k]ept saying that, you know, we better give him his money or something was going to happen. And I was just sitting there saying, [Carr], just go. Just get out of my house. Go. * * * Me and [Carr] are still, like, face to face yelling at each other. Telling him to get out of my room. And then I'm sitting there – standing in front of [Rutheford] and [Carr]'s pretty much using me as a shield against [Rutheford] and [Carr] went around me and started punching [Rutheford].**

(Tr. at 67).

{¶19} Kelsea and Rutheford testified that Carr punched Rutheford "at least three or four times." (Tr. at 68, 119). After Carr punched Rutheford, Kelsea testified that she again told Carr to leave, saying that if Carr did not go, she was going to call the police. (Tr. at 68). Next, she testified, Carr went into the closet in their bedroom and took money out of a shoe box where they were saving emergency funds. (Tr. at 68). Pictures of the closet in disarray were identified by both Kelsea and Rutheford. (State's Exs. 2-3). According to Kelsea's testimony Carr left shortly after going through the closet. (Tr. at 68, 73).

{¶20} Rutheford gave a similar account of the events, testifying that Kelsea woke him up and informed him of what was going on. Then, according to Rutheford, Carr came into the room, punched him, and took the money out of the closet.[6] (Tr. 120-121). He also testified to witnessing Kelsea block the door, to witnessing Carr push through the door which sent Kelsea flying across the room, and to hearing Kelsea tell Carr to get out of the room. (Tr. at 120-121, 149). Rutheford also testified, however, that Carr had been back to their bedroom on prior occasions to talk to Kelsea, so it was not his first time in the room. (Tr. at 148).

---

[6] Rutheford's story differs somewhat in the timeline of events, though he testified that all of the same events occurred. According to Rutheford, Carr came into the room, punched him several times, took the money from the closet, left the room, then Kelsea barred the door. It was at this point, according to Rutheford's testimony that Carr pushed the door in with Kelsea blocking it. (Tr. 119-121).

{¶21} Carr argues on appeal that he had the freedom to move throughout the house demonstrated by the facts that he could come and go as he pleased and that he had had been in the victims' bedroom on previous occasions. He argues his acts, therefore, could not constitute a trespass.

{¶22} First, we note that it is unclear whether Carr had permission to regularly go into Rutheford and Kelsea's bedroom. As Carr decided to wake Davis up so that she could go get Kelsea in her room, it implies that Carr would not regularly walk into the room uninvited. It is also far from clear that Carr was a regular visitor to the private bedroom of Kelsea and Rutheford. Furthermore, Kelsea's attempt to bar the door and the fact that Carr had to physically force himself into the room is evidence that Carr did not have permission on this occasion, if he ever had it at all.

{¶23} However, even assuming Carr may have previously had permission to be in Rutheford and Kelsea's bedroom, that privilege can be verbally revoked. *State v. Wisecup*, 12th Dist. No. CA2004-02-014, 2004-Ohio-5652, ¶ 10, citing *State v. Steffen*, 31 Ohio St.3d 111, 115 (1987); *see also State v. Helman*, 7th Dist. No. 03 CO 55, 2004-Ohio-4867, ¶ 10; *State v. Brooks*, 2nd Dist. No. 14115, 101 Ohio App.3d 260, 269 (1995). Both Kelsea and Rutheford testified that Kelsea had told Carr to leave. Kelsea testified that she had done so on multiple occasions that day. Moreover, Kelsea went so far as to physically bar the door in an attempt

to keep Carr out of the room after she had already asked him to leave. According to both Rutheford and Kelsea's testimony, Carr burst through the door with such force that it flung Kelsea across the room. Kelsea had, therefore, on this occasion both physically and verbally revoked any permission Carr may have had to be in their bedroom.

{¶24} While Carr next argues that no "legal" tenant ordered him to leave, Kelsea was listed on the lease as an occupant under "occupancy." (State's Ex. 6). The statute for criminal trespass states at R.C. 2921.11(A)(4) that an "owner *or occupant*" may revoke consent to remain on the premises. (Emphasis Added.) Based on the very language of the statute, and the fact that Kelsea was listed under "occupancy" on the lease, we find that Kelsea was authorized to revoke any privilege Carr may have possessed to enter their bedroom. Therefore, a reasonable jury could find that a trespass occurred in this case because even if Carr had permission to be in their bedroom, that permission had been affirmatively revoked.

{¶25} Although Carr focuses specifically on the "trespass" element of his Burglary conviction in his brief, we turn now to a review of the remaining elements of Burglary to analyze whether the conviction was against the manifest weight of the evidence. First, we find that a reasonable jury could find that force was used in committing this Burglary. The force requisite for a Burglary conviction has been found by such little intrusion as putting a foot in a doorway to

block a door from being closed and extending an arm into a residence. *State v. Stringer*, 9th Dist. No. 04CA0032-M, 2004-Ohio-6543, ¶ 35. Opening a back door has also been found to be "force" within the meaning of the Burglary statute. *State v. Wilson*, 8th Dist. No. 80270, 2002-Ohio-3107 ¶ 17. Here there is testimony that Carr not only opened the door to Kelsea and Rutheford's bedroom on multiple occasions but there is also testimony that Carr pushed through the door with sufficient force to send Kelsea flying across the room.[7] Based upon these facts, we find that a reasonably jury could find the "force" element satisfied.

{¶26} Furthermore, a reasonable jury could find that the elements of the Burglary statute requiring that the offense be one in an occupied or separately occupied portion of a habitation were also satisfied here, as there was testimony that the incident occurred in the bedroom of an apartment occupied by victims Rutheford and Kelsea.

{¶27} This leaves the element of doing all of the above with purpose to commit "any criminal offense." R.C. 2911.12(A)(2). Carr argues in his brief that he was not convicted of a theft offense, which he claims is an essential element of the crime. A reading of the statute shows that "any criminal offense" suffices for a Burglary conviction in violation of R.C. 2911.12(A)(2). Here, though Carr was charged with theft offenses of Robbery and Aggravated Robbery, he was not

---

[7] There was also testimony that this action resulted in Kelsea having a bruise on her leg.

found guilty of either. However, Carr was convicted of misdemeanor assault, and he is not challenging that conviction on appeal.[8] Thus a reasonable jury could find that Carr trespassed with the purpose to commit any criminal offense.

**{¶28}** For the foregoing reasons, we find Carr's conviction was not against the manifest weight of the evidence and the first assignment of error is overruled.

*Second Assignment of Error*

**{¶29}** In his second assignment of error, Carr argues that the trial court abused its discretion when it instructed the jury to disregard a portion of Kelsea's testimony, and that this ruling prejudiced Carr. Specifically, Carr argues that when Kelsea was being cross-examined and was asked about potentially false prior allegations of assault Kelsea and Rutheford may have made against someone else in the past, the response should have been allowed to reach the jury. Instead, the jury was instructed to disregard the question and the answer.

**{¶30}** At the outset, "[i]t is well settled * * * that decisions concerning evidentiary matters, including the scope of cross-examination, are within the broad discretion of the trial court and are not subject to reversal on appeal in the absence of an abuse of that discretion." *State v. Williams*, 3d Dist. No. 1-99-86, at *7, citing *In re Estate of Bednarczuk*, 80 Ohio App.3d 548 (12th Dist. 1992); *O'Brien v. Angley*, 63 Ohio St.2d 159, 163 (1980). An abuse of discretion constitutes more

---

[8] There was also testimony that Carr did commit a theft in taking money from Kelsea and Rutheford's closet. The amount was testified to be somewhere between $90-150.

than an error of law or judgment; rather, it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶31}** "Additionally, any error in the admission or exclusion of evidence will be considered harmless error unless it affects a substantial right of the accused." *State v. Wegmann*, 3d Dist. No. 1-06-98, 2008-Ohio-622, ¶ 41, citing *State v. Condon*, 1st Dist. No. C-020262, 2003-Ohio-2335, ¶ 80; Crim.R. 52(A); Evid.R. 103(A). Errors not affecting a defendant's substantial rights must be disregarded. *State v. Schofield*, 4th Dist., Nos 01CA36, 02CA13, 2002-Ohio-6945, ¶ 138, citing Crim.R. 52(A). In other words, an appellate court will not reverse judgments for an erroneous evidentiary ruling unless it appears that the defendant's rights have been prejudiced. *Id.*, citing *State v. Wollum*, 4th Dist. No. 95CA2083 (Mar. 5, 1996).

**{¶32}** The testimony at issue involves an assault case that was allegedly filed by both Kelsea and Rutheford against an individual other than Carr prior to this case. Defense counsel asked Kelsea, "Ms. Blanchard, you ever been involved in a case similar to this where you had made similar allegations?" (Tr. at 106). Before the question was answered, the State requested a sidebar and objected to the potential line of questioning as collateral "[u]nless it's a conviction or something that goes to truth or veracity." (Tr. at 106).

{¶33} The court allowed the question to be answered, but said that defense counsel was "stuck" with the answer. (Tr. at 107). What follows was the testimony given after the sidebar.

> **Q.  Have you ever been involved in a case in Municipal Court where you made similar allegations of somebody beating up either you or Steven, and were found not to have been telling the truth?**
>
> **\* \* \***
>
> **MR. HORD:  Continued objection.**
>
> **\* \* \***
>
> **A.   [Kelsea] The only thing that I can think of is when his Uncle Henry choked me.**
>
> **Q. Okay.**
>
> **A.   But that's it.**
>
> **Q.  And charges were filed?**
>
> **A.   Yes, they were, but they were dismissed.**
>
> **Q.  They were dismissed.**

(Tr. at 107-08).

{¶34} The State then again requested a sidebar, wherein the State argued that the question had tainted the jury. The State argued for a jury instruction and one was given to the jury striking the testimony and ordering the jury to disregard it. (Tr. at 109).

{¶35} Carr argues that under the Ohio Supreme Court case *State v. Boggs*, 63 Ohio St.3d 418 (1992), and our own subsequent case *State v. Messenger*, 3d Dist. No. 9-09-19, 2010-Ohio-479, that Carr is permitted, at the trial court's discretion, to cross-examine a victim about prior false allegations if they are clearly probative of truthfulness or untruthfulness pursuant to Evid.R. 608(B).

{¶36} Importantly, there is neither proof in the record nor any indication that any prior assault case filed by Kelsea or Rutheford was based upon a false accusation. The only answer that we have in the record is that the case was dismissed. Carr made no attempt to proffer any evidence beyond what was already heard by the jury. There is no evidence in the record that any of the underlying allegations were actually false. Moreover, Kelsea, who was being questioned, was not even the victim of the assault in this case. Rutheford was the victim of the assault and his credibility was never similarly impeached. Therefore, we do not find it was an abuse of discretion to exclude the testimony as it is well within the discretion of the trial court to exclude evidence that is determined not to be probative of truthfulness.

{¶37} However, even if it had been error for the trial court to exclude the statement and instruct the jury to disregard it, we find that any error would be harmless as Carr is unable to establish any prejudice. Carr's attempted impeachment of Kelsea does not diminish the fact that the jury heard evidence

from both Kelsea and Rutheford about the assault. Therefore, Carr's second assignment of error is overruled.

{¶38} For the foregoing reasons Carr's assignments of error are without merit and are overruled.

*Judgment Affirmed*

**PRESTON and ROGERS, J.J., concur.**

**/jlr**