[Cite as *State v. Sewell*, 2016-Ohio-7175.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                    CASE NO. 9-16-02

      v.

EUGENE SEWELL, JR.,                    O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Marion Municipal Court
Trial Court No. TRC157543

Judgment Affirmed

Date of Decision:   October 3, 2016

APPEARANCES:

    *Jeff Ratliff* for Appellant

    *Steven E. Chaffin* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Eugene Sewell, Jr. ("Sewell"), appeals the January 6, 2016 judgment entry of conviction and sentence of the Marion Municipal Court. He argues that his conviction for operating a motor vehicle while under the influence of alcohol, a drug of abuse, or a combination of them ("OVI") is not supported by sufficient evidence and is against the manifest weight of the evidence. He also argues that the trial court erred by allowing the law enforcement officer to testify to the effects of taking Tramadol and that he was denied his right to due process and a fair trial when the trial court did not allow him to present his explanation of his refusal to submit to sobriety testing. For the reasons that follow, we affirm.

{¶2} On September 13, 2015, Ohio State Patrol Sergeant Aaron Williams ("Williams") was on patrol and initiated a traffic stop of Sewell after Williams observed Sewell make a left turn without signaling. After noticing signs that Sewell was impaired, Williams administered some sobriety tests; however, Sewell refused to take divided-attention-skills tests when asked by Williams. Williams arrested Sewell for OVI.

{¶3} Sewell was charged with OVI in violation of R.C. 4511.19(A)(1)(a), a first-degree misdemeanor; OVI refusal with a prior conviction in violation of R.C. 4511.19(A)(2), a first-degree misdemeanor; and failure to signal in violation of R.C.

4511.39, a minor misdemeanor. (Doc. No. 1). On September 15, 2015, Sewell entered pleas of not guilty to the offenses. (Doc. No. 4).

{¶4} The case proceeded to a jury trial on January 6, 2016. (Jan. 6, 2016 Tr. at 4). On the day of trial, Sewell filed a motion in limine to exclude testimony regarding Tramadol; however, the trial court ultimately allowed the admission of evidence concerning Tramadol. (Doc. No. 17). (*See also* Jan. 6, 2016 Tr. at 5, 68). The jury found Sewell guilty of OVI and OVI refusal with a prior conviction. (Jan. 6, 2016 Tr. at 370). The trial court found Sewell guilty of the turn-signal violation. (*Id.* at 383). The State moved to dismiss the OVI-refusal-with-a-prior-conviction count, and the trial court granted the State's motion. (Jan. 6, 2016 Tr. at 377-379); (Doc. No. 23). The trial court sentenced Sewell on the OVI and turn-signal-violation counts. (Jan. 6, 2016 Tr. at 381-384). (*See also* Doc. No. 18).

{¶5} Sewell filed his notice of appeal on January 12, 2016. (Doc. No. 35). He raises four assignments of error for our review. We will first consider together his second and third assignments of error, followed by his first and fourth assignments of error.

### Assignment of Error No. II

**Because the State failed to establish a nexus between appellant's alleged impaired condition and a drug of abuse, or a combination of alcohol and a drug of abuse, there was insufficient evidence to find appellant guilty of R.C. 4511.19(A)(1)(a), and R.C. 4511.19(A)(2).**

-3-

## Assignment of Error No. III

**Because the State failed to establish a nexus between appellant's alleged impaired condition and a drug of abuse, or a combination of alcohol and a drug of abuse and the ample evidence that was presented against the State, appellant must be found not guilty based on the manifest weight of the evidence.**

{¶6} In his second and third assignments of error, Sewell argues that his OVI conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. Specifically, Sewell argues that the State was required to "prove a nexus between the drug or drugs ingested and the impairment." (Appellant's Brief at 10). Sewell argues, in other words, "The State must do more than simply present evidence that Appellant had taken tramadol and showed signs of impairment, or that Appellant had taken tramadol, mixed tramadol with alcohol, and showed signs of impairment." (*Id.*).

{¶7} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997), fn.4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶8} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's

judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶9} In this appeal, Sewell challenges his OVI conviction under R.C. 4511.19(A)(1)(a). That statute provides, in relevant part: "No person shall operate any vehicle * * * within this state, if, at the time of the operation, * * * [t]he person is under the influence of alcohol, a drug of abuse, or a combination of them." R.C. 4511.19(A)(1)(a). On appeal, Sewell challenges only the "under the influence of alcohol, a drug of abuse, or a combination of them" element of the offense. Specifically, he argues that the State failed to prove a "nexus" between the Tramadol Sewell ingested and his impairment. He argues that the State "presented a case of alcohol and tramadol, in essence a combination case for the jury." (Appellant's Reply Brief at 5). After reviewing the record in this case, we conclude that the State presented sufficient evidence that Sewell was under the influence of alcohol alone and that the manifest weight of the evidence does not weigh against the presence of that element of the offense. *See State v. May*, 2d Dist. Montgomery No. 25359, 2014-Ohio-1542, ¶ 54. Accordingly, we need not and do not address Sewell's "nexus" argument. Rather, we will review the evidence presented at trial and then analyze the sufficiency and manifest weight of the evidence concerning whether Sewell was under the influence of alcohol.

{¶10} Williams was the State's lone witness at trial. (Jan. 6, 2016 Tr. at 94). Williams testified that he has been a trooper with the Ohio State Highway Patrol since 2004 and is trained in alcohol detection and field sobriety testing. (*Id.* at 95-100). He testified that, in particular, he has performed the horizontal gaze nystagmus ("HGN") test[1] over 1,000 times, and he has arrested approximately 1,000 impaired drivers. (*Id.* at 100). Williams testified that he was on patrol in the early morning hours of September 13, 2015. (*Id.* at 100-101). At 2:27 AM, he pulled Sewell over after observing Sewell fail to use his turn signal when he stopped at a stop sign on Farming Street and made a left turn to travel southbound on Main Street in Marion, Ohio. (*Id.* at 103-104).

{¶11} Williams testified that he approached the vehicle's driver's side and noticed Sewell in the driver's seat and "a much younger female in the front passenger seat." (*Id.* at 106). Williams testified, "While I'm up there, I notice a very strong odor of alcoholic beverage coming from inside the vehicle, and at that point also I notice an open Coors light beer can setting in the center console cup holder." (*Id.* at 107). According to Williams, he had Sewell step out of the vehicle and into the front passenger seat of Williams's cruiser, with Williams in the driver's seat. (*Id.* at 107-109). Williams described Sewell's demeanor in the cruiser: "He

---

[1] "The HGN test is one of several field sobriety tests used by police officers in detecting whether a driver is intoxicated. 'Nystagmus' is an involuntary jerking of the eyeball. 'Horizontal gaze nystagmus' refers to a jerking of the eyes as they gaze to one side." *State v. White*, 3d Dist. Allen No. 1-13-27, 2014-Ohio-555, ¶ 26, fn. 5, quoting *State v. Homan*, 89 Ohio St.3d 421, 422 (2000), fn. 1.

was very evasive, like wanting me to just hurry up and get him on his way. He wanted to leave. He wanted to separate from me, was very evasive." (*Id.* at 109). Williams testified that he noticed "the strong odor of an alcoholic beverage coming from [Sewell's] person." (*Id.* at 109-110). Williams added that Sewell's eyes "were bloodshot and glassy" and that Sewell's speech was slurred. (*Id.* at 110, 126).

{¶12} Williams testified that, before administering field sobriety tests on Sewell, he asked Sewell if he took any medications or had any eye or head injuries, and Sewell said "he took a Tramadol pill earlier that day" but had no eye or head injuries. (*Id.* at 111). According to Williams, based on his training, "Tramadol is a narcotic, and narcotic is one of the seven drug classifications * * * that people become impaired by." (*Id.* at 115). When asked by the prosecutor "whether [Tramadol] would have any effect on the gaze nystagmus, Williams responded, "No. Narcotics do not cause HGN." (*Id.* at 115). Williams testified that he administered the HGN test on Sewell and detected six out of six clues. (*Id.* at 117-123). Williams added that, according to the National Highway Traffic Safety Administration manual, "the probability that somebody is going to be over an .08 by alcohol is 88 percent when you observe six out of six." (*Id.* at 123). According to Williams, he next administered the vertical gaze nystagmus ("VGN") test.[2] (*Id.*).

---

[2] Williams testified that, whereas HGN refers to a horizontal jerking of the eyes as they gaze to one side, VGN refers to a "vertical jerking of the eye." (Jan. 6, 2016 Tr. at 124).

Williams testified that he observed VGN in Sewell and that VGN can be "present in high doses of alcohol." (*Id.* at 124).

{¶13} Williams testified that he asked Sewell whether he had consumed alcohol. (*Id.* at 131). According to Williams, "[Sewell's] first response was he did not know how much he had, and then he changed it to a couple beers." (*Id.*). Williams testified that, "throughout the entire duration of [their] conversation," Sewell gave him more information about the alcohol Sewell consumed that day. (*Id.*). According to Williams, Sewell told him that he consumed three beers "during the Notre Dame football game" and that he consumed additional alcoholic beverages at Club Rehab. (*Id.* at 131-132). When asked how much alcohol Sewell consumed at Club Rehab, Williams testified:

> Well, it changed from he didn't know at one point and then it changed
>
> to a couple beers, and then after he told me about him consuming three
>
> beers during the football game he stated he had a drink. I don't know
>
> – I believe it was a beer and a glass of water.

(*Id.* at 132). When asked how many beers Sewell consumed, Williams responded, "I had counted anywhere between, from what he stated, five or six beers." (*Id.*).

{¶14} The prosecutor asked Williams if the information Sewell provided concerning his alcohol consumption was consistent with Williams's observations of Sewell during the traffic stop. (*Id.* at 132-134). Williams responded that he did not

know when the Notre Dame football game took place that day, but if it took place during the "afternoon-evening hours," then he would not have "observed [VGN] and even six out of six clues with that time frame." (*Id.* at 133). Williams added, "It's either his timing of the drinks, the amount of drinks he said was incorrect, or the amount that he drank is incorrect." (*Id.* at 134).

{¶15} Williams testified that he administered some "nonstandardized tests" on Sewell. (*Id.* at 134). Namely, he asked Sewell to "recite the alphabet from the letter C to the letter X, and he did it correctly." (*Id.*). When asked if this was a divided-attention test, Williams said, "I don't see how * * *. * * * [J]ust reciting the alphabet there's no divided attention." (*Id.* at 134-135). According to Williams, he asked Sewell if he wanted to perform the standardized divided-attention tests, and Sewell refused. (*Id.* at 135-136). Williams testified that he placed Sewell under arrest because, based on his training and experience, he believed Sewell "was impaired to operate a motor vehicle safely." (*Id.* at 136-137). Once at the jail, Sewell also refused to take a breath test or a urine test. (*Id.* at 138). According to Williams, Sewell "was very belligerent" and "upset about some money being missing." (*Id.* at 140).

{¶16} On cross-examination, Sewell's counsel asked Williams whether he observed Sewell commit various traffic violations, and Williams ultimately responded, "[T]he only issues I saw prior to approaching the vehicle was [sic] the

turn signal and improper turn." (*Id.* at 159-167). Williams testified that when he asked Sewell for his driver's license, proof of insurance, and registration, Sewell handed Williams his driver's license. (*Id.* at 168-170). Williams testified that the open container of Coors Light was full before he poured it out; however, Williams could not recall whether the can was cold. (*Id.* at 170-171). Williams testified that he found "in the back" of the vehicle another open container—a wine cooler—later in his investigation during the stop. (*Id.* at 172-173). Williams testified that he believed the female passenger in Sewell's vehicle had been drinking. (*Id.* at 173). Williams testified that the odor of alcoholic beverage "was about approximately the same" when he was standing "right next to" Sewell's side of the vehicle and when he was in his cruiser with Sewell. (*Id.* at 174).

{¶17} Williams admitted that he "didn't notice any mannerisms abnormal with [Sewell] getting out of the car." (*Id.* at 178). Williams added that Sewell did not have any balance issues walking from Sewell's vehicle to the cruiser; however, Williams testified, "That's the only observation of walking I had." (*Id.* at 180). Williams acknowledged that, as he and Sewell were walking from Sewell's vehicle to Williams's cruiser, Sewell understood what Williams was saying and was following Williams's directions "[f]or the most part." (*Id.* at 181).

{¶18} When asked about his administration of the nystagmus tests on Sewell, Williams reiterated, "Tramadol is a narcotic analgesic and it does not cause HGN."

(*Id.* at 203). Williams testified that he did not verify the milligrams of Sewell's Tramadol prescription or who prescribed the medication to Sewell. (*Id.*). Williams added, "I do not know what time he took his Tramadol." (*Id.* at 204). Williams testified, "[Sewell] was arrested on the basis of operating a motor vehicle under the influence of alcohol or drugs, or a combination of the two." (*Id.*). When asked when Sewell drank "his beers at Club Rehab," Williams responded:

> He gave me multiple stories. * * * He told – I don't know about which time was which beer. I know he stated he didn't know how much he had to drink. I know that he stated then that he'd had a couple of beers. Then I know he stated he had three beers during the Notre Dame game, and then I know he said – he changed his story to drinking one beer and one glass of water at Club Rehab. I believe he said that drink was approximately 1:00 a.m.

(*Id.* at 205-206). Williams testified that he did not have any evidence that Sewell ingested Tramadol and consumed alcohol simultaneously. (*Id.* at 206). Nor does Williams know how long Tramadol remains in one's system. (*Id.*). Williams clarified, "He took the Tramadol earlier in the day and then he drank earlier in the day as well. Whether he took it simultaneously or several hours after one or the other, the medication is still going to be in your system." (*Id.*). Williams testified

that, after the arrest, he did not research information concerning Tramadol. (*Id.* at 208).

{¶19} Williams testified that, when he asked Sewell to recite the alphabet from C to X and to count backwards from 57 to 42—the "nonstandardized tests" that Williams administered—Sewell performed the tests correctly. (*Id.* at 211-213). Williams testified that Sewell delayed in beginning the alphabet test after receiving the instructions from Williams, but when he did begin the test, he recited all of the letters from C to X. (*Id.* at 244-245). When Sewell's counsel asked Williams about his conversation with the passenger in Sewell's vehicle, Williams testified, "She stated she saw him drink two shots of liquor" at the bar. (*Id.* at 252).

{¶20} The State rested, and Sewell moved under Crim.R. 29 for acquittal, arguing that the State did "not establish a nexus between the Defendant's impaired condition and a drug of abuse," Tramadol. (*Id.* at 266-267). Sewell's counsel concluded, "There is no sufficient evidence to find the Defendant guilty of any OVI involving Tramadol." (*Id.* at 268-269). Counsel for the State responded, "There's been plenty of evidence. Mr. Sewell's own admission of consumption of alcohol and also the observations of the officer with his experience and training. So there's plenty of evidence to find him guilty." (*Id.* at 269). The trial court overruled Sewell's Crim.R. 29 motion. (*Id.*).

{¶21} Sewell testified in his defense. (*Id.* at 283). He testified that, on September 12, 2015, he woke up at 4:10 AM and arrived at work before his workday began at 6:00 AM. (*Id.* at 286-287). According to Sewell, he got off work at noon, went home, and immediately took a Tramadol as prescribed to him for back pain. (*Id.* at 287-288). Sewell testified that he consumed three 12-ounce, Coors Light beers while watching the Notre Dame football game around 3:30 PM that day. (*Id.* at 289-290). According to Sewell, he ate a burger and either fries or fried pickles. (*Id.* at 290). He testified that, after the football game, he went to "a buddy's house" for "the Mayweather fight." (*Id.*). After that, at around 10:00 PM, Sewell went to Marion because his "buddy * * * was doing a show" at Club Rehab. (*Id.* at 285, 290-292). Sewell picked up "[a] friend of [his]" on the way to Marion. (*Id.* at 293). According to Sewell, they were at Club Rehab until a little after 2:00 AM on September 13, 2015 and "closed the place down." (*Id.* at 292). Sewell testified that he had two beers at Club Rehab. (*Id.* at 292-293).

{¶22} Sewell testified that he left Club Rehab and "thought [he] was going home." (*Id.* at 294). Sewell testified that the open can of beer in his car was in the car since when he left his "buddy's house." (*Id.* at 295-296). When asked if the beer can was empty or nearly empty, Sewell responded, "It was full. I think I took one drink out of it. It wasn't good." (*Id.* at 296). When asked why he refused to perform additional field sobriety tests, Sewell responded, "To me, I figured if they

were important enough he wouldn't have been wasting my time with the other three tests that he said weren't important." (*Id.* at 298). Sewell testified that, when Williams pulled him over on September 13, 2015, he was not impaired. (*Id.* at 300). Sewell testified that he refused to take the chemical tests because he "was upset" and "really, really angry at the officer" because of "the fashion in which [he] got arrested." (*Id.* at 301). Sewell added, "I thought [Williams] could have approached my situation a little bit better." (*Id.* at 303).

{¶23} Sewell testified that he has prior OVI offenses on his record. (*Id.* at 298). When asked how many, Sewell responded, "Two, maybe." (*Id.* at 298-299). According to Sewell, the first occurred when Sewell was 21 years old, and he "went in there and told them [he] was guilty and that was that." (*Id.* at 299). Sewell testified that the second occurred "maybe five years ago" and that he "pleaded no contest because [he] was guilty." (*Id.* at 300).

{¶24} On cross-examination, Sewell testified that he does not drink alcohol daily and instead drinks on "[s]pecial occasions," such as "big football games." (*Id.* at 306-307). When asked if he was "careful about how many beers [he] was drinking that day," Sewell responded, "Not real careful, just not in the mood per se. After the football game, it was kind of blah." (*Id.* at 309). Sewell testified that he takes Tramadol "[n]ot even monthly" and only when he does a "particular job" that

"puts a strain on [his] back." (*Id.* at 310). He testified that he does not know how long Tramadol "last[s] when [he] take[s] one." (*Id.* at 314).

**{¶25}** We first review whether the State presented sufficient evidence that Sewell was "under the influence of alcohol" when he operated his vehicle on September 13, 2016. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). We conclude that it did. The State presented evidence showing that, after Williams pulled Sewell over for failing to signal, Williams noticed open containers of alcohol in the vehicle. Williams noticed a "strong odor" of alcoholic beverage coming from Sewell's person. *See State v. Williams*, 5th Dist. Stark No. 2015CA00211, 2016-Ohio-3364, ¶ 23. Williams also observed that Sewell's eyes were "bloodshot and glassy" and that Sewell's speech was slurred. *See State v. Hess*, 9th Dist. Wayne No. 12CA0064, 2013-Ohio-4268, ¶ 15. Sewell admitted to drinking alcohol, was evasive and changed his story during the stop, and exhibited belligerent behavior during the stop. *See id.*; *State v. Furguson*, 1st Dist. Hamilton No. C-130173, 2013-Ohio-5388, ¶ 15. Sewell exhibited six out of six clues during the HGN test, and he exhibited VGN as well. *See State v. Reynolds*, 2d Dist. Greene No. 2012-CA-64, 2014-Ohio-3642, ¶ 46. Williams's testimony is corroborated by the video of the traffic stop, which allowed the jurors to observe Sewell's demeanor for themselves. *See State v. Nash*, 5th Dist.

Stark No. 2014CA00159, 2015-Ohio-3361, ¶ 20. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Sewell was under the influence of alcohol.

{¶26} We next address whether Sewell's OVI conviction is against the manifest weight of the evidence—specifically, whether the manifest weight of the evidence weighs against the presence of the "under the influence of alcohol" element. *See Velez* at ¶ 76. Weighing in favor of Sewell's OVI conviction is the evidence we mentioned above in addressing the sufficiency of the evidence. Weighing against Sewell's conviction is Williams's testimony that Sewell was cooperative at first, exited his vehicle without any abnormal mannerisms, understood what Williams was saying, and followed Williams's directions for the most part. Sewell walked from his vehicle to the cruiser without any balance issues; however, as Williams noted, that was the only observation he had of Sewell walking. When asked to do so by Williams, Sewell correctly performed the nonstandardized tests of reciting the alphabet from C to X and counting backwards from 57 to 42; however, Sewell delayed in beginning the alphabet test. Sewell testified that he consumed three 12-ounce beers during Notre Dame's 3:30 PM football game on September 12, 2013, two beers at Club Rehab, and one sip out of the open-container beer that was in his vehicle's console when Williams pulled him over. In other words, according to Sewell, he consumed just over five beers in an

approximately 11-hour period; however, as we noted above, Sewell's story concerning the amount of alcohol he consumed changed during the stop. Finally, Sewell testified that he was not impaired when Williams pulled him over.

**{¶27}** The evidence weighing against Sewell's OVI conviction is underwhelming compared to the evidence of multiple indicators that he operated his vehicle while under the influence of alcohol. Moreover, the jury was "in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *State v. Miller*, 3d Dist. Seneca No. 13-12-52, 2013-Ohio-3194, ¶ 48, citing *State v. Thompson*, 3d Dist. Crawford No. 3-10-23, 2011-Ohio-3631, ¶ 13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, because the jury was in the best position to resolve issues of credibility, and because evidence weighs in favor of the conviction, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Sewell's OVI conviction is not against the manifest weight of the evidence.

**{¶28}** Sewell's second and third assignments of error are overruled.

### Assignment of Error No. I

**The trial court erred by allowing a police officer to testify as to the effects of Tramadol and the effects of Tramadol mixed with alcohol.**

{¶29} In his first assignment of error, Sewell argues that the trial court erred by allowing the State "to present expert testimony regarding tramadol and its side effects, and its side effects when mixed with alcohol through Trooper Williams." (Appellant's Brief at 8). Sewell argues, in other words, "The trial court allowed Trooper Williams to testify to information that would be properly reserved for an expert." (*Id.*). Also under this assignment of error, Sewell argues that the trial court erred by not giving the jury the limiting instruction requested by Sewell concerning the evidence of Sewell's ingestion of Tramadol.

{¶30} A trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Heft*, 3d Dist. Logan No. 8-09-08, 2009-Ohio-5908, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Accordingly, a trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion that has created material prejudice. *Id.*, citing *Issa* at 64. Similarly, "'[w]hen reviewing a court's refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal to give said instruction was an abuse of discretion under the facts and circumstances of the case.'" *State v. Simonis*, 3d Dist. Seneca No. 13-14-05, 2014-Ohio-5091, ¶ 31, quoting *State v. Kunz*, 6th Dist. Wood No. WD-10-047, 2011-Ohio-3115, ¶ 30, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion suggests the trial

court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶31}** To constitute reversible error, the improper admission of evidence or the failure to properly instruct the jury must affect a substantial right of the accused. *State v. Carr*, 3d Dist. Union No. 14-11-20, 2012-Ohio-1679, ¶ 31, citing *State v. Wegmann*, 3d Dist. Allen No. 1-06-98, 2008-Ohio-622, ¶ 41, Crim.R. 52(A), and Evid.R. 103(A); *State v. Noggle*, 140 Ohio App.3d 733, 749 (3d Dist.2000). "'"[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction."'" *State v. Schaeffer*, 3d Dist. Seneca No. 13-14-34, 2015-Ohio-3531, ¶ 87, quoting *State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶ 53, quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166 (1983), fn. 5. "Errors not affecting a defendant's substantial rights must be disregarded." *Carr* at ¶ 31, citing *State v. Schofield*, 4th Dist. Washington Nos. 01CA36 and 02CA13, 2002-Ohio-6945, ¶ 138, citing Crim.R. 52(A). "In other words, an appellate court will not reverse judgments for an erroneous evidentiary ruling unless it appears that the defendant's rights have been prejudiced." *Id.*, citing *Schofield* at ¶ 138.

**{¶32}** The record in this case reflects that Williams testified that, before administering the HGN test on Sewell, he asked Sewell whether he had taken any medications. (Jan. 6, 2016 Tr. at 111). According to Williams, Sewell responded

that "he took a Tramadol pill earlier that day." (*Id.*). Counsel for the State asked whether Tramadol would affect the HGN test. (*Id.* at 112-115). Over Sewell's objection, Williams testified that "Tramadol is a narcotic," that "narcotic is one of the seven drug classifications * * * that people become impaired by," and that "[n]arcotics do not cause HGN." (*Id.* at 115). On cross-examination, Sewell's counsel questioned Williams concerning whether Williams verified the dose of Tramadol Sewell ingested and when Sewell ingested the Tramadol. (*Id.* at 203-204). When instructing the jury, the trial court stated that, to find Sewell guilty of OVI, it was required to find beyond a reasonable doubt that he "operated a motor vehicle while under the influence of alcohol and/or drug of abuse." (*Id.* at 354). The trial court instructed the jury "that Tramadol is a 'drug of abuse.'" (*Id.* at 355).

{¶33} Even assuming without deciding that the trial court abused its discretion by allowing Williams to testify to the effects of Tramadol and by failing to give the jury Sewell's requested limiting instruction concerning Tramadol, we conclude that any error was harmless because—disregarding all evidence related to Tramadol—the State presented substantial evidence that Sewell operated his vehicle while under the influence of alcohol. *See State v. Robertson*, 5th Dist. Richland No. 11CA0046, 2012-Ohio-2955, ¶ 36 ("Based on the substantial evidence that she was driving under the influence of alcohol admitted at trial, any error in admitting the

results of the HGN test is harmless."). We discussed that evidence above in our treatment of Sewell's second and third assignments of error.

{¶34} Sewell's first assignment of error is overruled.

### Assignment of Error No. IV

**Appellant was denied his right to due process and a fair trial when the trial court did not allow defendant to present his explanation to his refusal to submit to testing and to present and attack the bias and credibility of the trooper.**

{¶35} In his fourth assignment of error, Sewell argues that he "was not allowed to present a complete defense when the trial court did not let him provide complete explanations for his refusal to submit to testing." (Appellant's Brief at 19). Specifically, Sewell argues that the prosecutor mentioned Sewell's refusal twice in his closing argument, but "the jury was able to hear only the explanation that Sewell was upset and really angry at the officer." (*Id.* at 22). Sewell argues that the trial court did not allow him to elaborate concerning the reasons why he was upset and angry with the officer—namely, that Williams argued with Sewell "regarding his possible infidelity and morality"; that there was $500 missing from Sewell's wallet during the traffic stop; that Williams did not assist him in retrieving the missing money; and that Williams answered a phone call from Sewell's wife to Sewell's cell phone without permission. (*Id.*). Sewell also argues that the trial court "did not allow further inquiry into the credibility and bias of Trooper Williams regarding the morality of the circumstances surrounding the arrest" and regarding

the ongoing investigation initiated by Sewell against Williams concerning the missing money. (*Id.* at 23). Finally, Sewell argues that these errors by the trial court and other errors amount to "cumulative error" warranting reversal of Sewell's conviction. (*Id.* at 24).

**{¶36}** Notwithstanding the title of Sewell's fourth assignment of error, our review of his argument indicates that he is challenging the trial court's evidentiary rulings. As we stated above, a trial court has broad discretion in determining whether to admit or exclude evidence, and a trial court's ruling concerning the admissibility of evidence will not be overturned absent an abuse of discretion that has created material prejudice. *Heft*, 2009-Ohio-5908, at ¶ 62, citing *Issa*, 93 Ohio St.3d at 64. Moreover, even if a trial court abuses its discretion in admitting or excluding evidence, to constitute reversible error, the erroneous evidentiary ruling must affect a substantial right of the accused. *Carr*, 2012-Ohio-1679, at ¶ 31, citing *Wegmann*, 2008-Ohio-622, at ¶ 41, Crim.R. 52(A), and Evid.R. 103(A). Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 230. "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different

but for the combination of the harmless errors.'" *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

**{¶37}** We begin by pointing out that Sewell was allowed to testify that he refused to submit to field-sobriety and chemical testing because he was angry and upset with Williams. As Sewell admits, his counsel was allowed to elicit on cross-examination that Williams "got into an argument with Sewell concerning infidelity and having an affair." (Appellant's Brief at 23). Nevertheless, assuming without deciding that the trial court abused its discretion by not allowing Sewell to elaborate concerning the reasons for his refusal and by limiting his counsel's cross-examination of Williams, we conclude that any error was harmless because, as we discussed above, the State presented substantial evidence that Sewell drove his vehicle while under the influence of alcohol independent of any evidence of drug usage. *See Robertson*, 2012-Ohio-2955, at ¶ 36. We also reject Sewell's cumulative-error argument because that doctrine is not applicable. Even assuming without deciding that the trial court erred in this case, none of the errors, whether considered individually or cumulatively, resulted in prejudice. *See Pickens* at ¶ 231. In short, Sewell received a fair trial. *See id.*

**{¶38}** Sewell's fourth assignment of error is overruled.

**{¶39}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**